## CALVERT BUILDING & CONSTRUCTION CO. v. ELEAZUR WINAKUR ET AL.

## GEORGE WALDHAUSER v. ELEAZUR WINAKUR ET AL.

[Nos. 4, 5, January Term, 1928.]

520

*Decided February 20th, 1928.*

The causes were argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Richard S. Culbreth,* for the Calvert Building & Construction Company, appellant.

*John R. M. Staum,* submitting on brief, for George Waldhauser, appellant.

*John Watson,* with whom was *William R. Price* on the brief, for the J. L. Appleby Company and Paul N. DeCrette, appellees.

*Randolph Barton, Jr.,* with whom were *Hiram J. Weiskopf* and *Louis Milnick* on the brief, for Eleazur Winakur, appellee.

PARKE, J., delivered the opinion of the Court.

There are two appeals on this record that present a controversy arising among a former landlord, a mortgagee of goods and chattels, and certain creditors, over the proceeds of sale of this personalty which had been owned by one whose relation with each had been respectively that of tenant, mortgagor, or debtor. The landlord was the Calvert Building & Construction Company, appellant, which, on August 31st, 1921, had leased unto Paul M. DeCrette a portion of its premises to be used for a lunchroom and kitchen during a term of five years, beginning on October 1st, 1921, at a yearly rental of seven thousand dollars and of a sum to be ascertained by the quantity of electric current consumed on the premises demised at a fixed rate. The definite rental was to be paid in equal monthly payments in advance on the first day of every month during the term, and the indefinite rental, which was to be computed on the electric current used, was payable on or before the tenth day of every succeeding month of the demise. The tenant did not prosper, was in debt, fell in arrear with his rent, and in July, 1924, when his arrears of rent were $1,824.95, desired to be relieved

of his obligations as tenant. At the landlord's request, the tenant submitted a list of his overdue accounts, and the landlord, in order to afford the tenant an opportunity to pay these debts, agreed to extend the time for the payment of the rent due and to become due until the first day of October, 1924, when such rent would aggregate the sum of $3,321.61, estimating the electric current to be consumed at $658.50, which was $121.70 in excess of the amount later found to have been used. The agreement was in writing and was executed on July 15th, 1924, by the landlord and tenant. In addition to the provision for the extension of time for the payment of the monthly installments of rent, the original lease was amended so as to contain the stipulation that:

"All fixtures, appliances, furniture and machinery installed by the lessee shall be the property of the lessor, provided, however, that if at the expiration of the lease by lapse of time or otherwise the rent shall have been paid in full and all the covenants of the lease shall have been performed, said property shall revert to and become the property of the lessee."

The extension of time did not enable the tenant to meet his obligations, and, the full amount of the rent to October 1st, 1924, remaining unpaid, the landlord and tenant executed, on September 30th, 1924, a sealed instrument, which, omitting the formal beginning and ending, was of the following tenor:

"Whereas the said DeCrette is indebted to the said corporation in the sum of thirty-three hundred and twenty-one ($3321) dollars and sixty-one (61) cents for rent due under the lease from said corporation to him of the premises described therein as the basement story of the Calvert Building dated the thirty-first day of August, 1921, and under an agreement between the said parties dated the fifteenth day of July, 1924;

"And whereas the said Decrette desires to surrender said lease and to vacate said premises and to deliver the personal property therein and thereon to said corporation;

"Now this agreement witnesseth that the said De-Crette does hereby surrender said lease and vacate said premises and deliver said personal property to said corporation;

"And the said corporation hereby accepts the surrender of said lease and discharges and releases the said DeCrette from the payment of said sum of thirty-three hundred and twenty-one dollars and sixty-one cents."

The effect of this surrender and release was to end the relation of landlord and tenant and to put the corporation in full possession of the premises and of the personal property, but, in order that the former landlord might have the advantage of a going business in its effort to secure a new tenant, the appellant, as the owner of the premises, entered into a written agreement under seal with DeCrette on October 1st, 1924, whereby the owner employed DeCrette on that date to conduct as the agent of the corporate owner the cafeteria business on the same premises. DeCrette's compensation was to be a sum equal to the net profits of the business, and it was expressly provided that, in the ascertainment of such net profits, the business was not to be charged with the expense of either rent or light. DeCrette was to render a weekly statement of the business which was stated to be temporary in nature, and could be terminated at the option of either party by giving the other party notice of ten days in writing. The agreement further set forth that the corporation assumed "no liability for any debt which the said DeCrette may have previously contracted in the cafeteria business previously conducted by him on said premises on his own account," but that these would be paid by DeCrette with as little delay as possible.

The corporate owner was thereby enabled in the early part of November, 1924, to conclude its negotiations of about two months with prospective tenants, and to lease the premises to them for a term of five years from January 15th, 1925, and to sell to the new tenants the chattels which it had obtained

from DeCrette for the sum of $4,000. On November 13th, 1924, the corporation gave the prescribed written notice to DeCrette, who elected to terminate his agency on November 15th, 1924, and the cafeteria was closed on that day, and on November 17th the new lease was executed. After the execution of this lease, but on the same day, the corporation received a letter from H. J. Weiskopf, which was dated and mailed on Saturday, November 15th, notifying the corporation that he had that day been appointed by decree of the Circuit Court No. 2 of Baltimore City trustee to sell under mortgage foreclosure the chattels formerly owned by De-Crette, but then in the possession of the corporation, and that unless the mortgage indebtedness be paid on or before the 30th of November, 1924, the property would be advertised for sale. The proceedings referred to were to foreclose a mortgage on the chattels mentioned that had been given by DeCrette on March 6th, 1924, to Eleazur Winakur, to secure a purporting indebtedness of five thousand dollars. The principal amount was payable in fifty-one weekly installments of seventy-five dollars each, and the residue of eleven hundred and seventy-five dollars at the expiration of fifty-two weeks from the date of the mortgage. The mortgage contained a covenant of the mortgagor to pay to the landlord of the premises where the chattels were located the monthly installment of rent by the third of every month. In case of default in the payment of the mortgage debt and of the rental, the mortgagor assented to the passage of a decree for the sale of the property mortgaged in accordance with the Acts of 1898, ch. 123, secs. 720-732. This mortgage was duly executed and recorded within a day from its date, and while this put the corporation on constructive notice, it did not have actual notice of this chattel mortgage until the receipt of the letter of the trustee on the early afternoon of November 17th. As soon as the corporation received the letter, it began negotiations with the trustee, to whom the court had decreed the immediate surrender of the chattels, and obtained his consent to wait for thirty days from November 18th before proceeding further with the foreclosure proceedings. The chattels meanwhile

remained in the possession of the corporation, which on November 25th distrained the chattels for rent in arrear to November 1st, 1924. This action created a situation where the chattels were at once claimed by the corporation under its distress for rent, and by the trustee for their sale under the foreclosure proceedings, and by the new tenants as purchasers from the corporation. Under these circumstances, it was agreed on November 27th that the corporation would indemnify the new tenants from loss, and that the chattels would be sold by the trustee, and the conflicting claims of the corporation and the mortgagee would be asserted against the proceeds of such sale. On December 13th, the trustee reported the sale of the chattels to the corporation for $2,700; the sale was duly ratified on January 10th, 1925, after it had been objected to on the ground of inadequacy of price, and the account of the auditor distributed the sum of $2,300 to the mortgagee in full payment of his mortgage claim, and the residue of the net proceeds of sale, amounting to $224, was distributed to the Calvert Building & Construction Company of Baltimore City The latter excepted to the ratification of the auditor's account on the ground that the entire net proceeds of $2,524 should have been distributed to it as rent in arrear. DeCrette and J. L. Appleby & Company, a judgment creditor, excepted to the allowance of the mortgagee's claim in full, claiming it was usurious in part, and to the distribution of any part of the fund to the former landlord, each of these two exceptants claiming the residue after the payment of the amount actually due to the mortgagee.

The claim of the J. L. Appleby Company had been filed in the proceedings and was based on a judgment against DeCrette, obtained on January 3rd, 1925, in the Baltimore City Court, for $1,326.23, and a *fieri facias* issued thereon on January 6th, 1925. Another judgment creditor, George Waldhauser, trading as the Clover Dairy, had obtained a judgment in the Baltimore City Court against DeCrette on January 10th, 1925, for $999.35, and, pursuant to leave granted him on January 13th, 1925, by the court in the pend-

ing equity cause, an attachment on his judgment had been issued and laid in the hands of the trustee Weiskopf on February 17th, 1925, and on March 9th, 1925, a judgment of condemnation *nisi* had been obtained. These attachment proceedings were brought to the attention of the chancellor by being filed in the cause. The several parties took testimony in open court before the chancellor in support of their respective claims, and the final decree gave priority to the mortgage indebtedness, after it had been reduced to the extent of usury exacted, and distributed the residue, together with any accrued interest, between the J. L. Appleby Company and George Waldhauser, trading as the Clover Dairy, in proportion to their respective claims. From this decree an appeal was taken by the Calvert Building & Construction Company of Baltimore City, and also by George Waldhauser, trading as the Clover Dairy.

On November 25th, 1924, the owner's solicitor delivered to DeCrette a written notice declaring the recited agreements between it and DeCrette of July 15th, September 30th, and October 1st, 1924, to be rescinded for fraud. After the delivery of this note, but on the same day, the owner first began its distraint proceedings pursuant to which the chattels were seized, and then its solicitor mailed to the trustee to foreclose the chattel mortgage a letter enclosing a copy of the notice to DeCrette, and advising him of the distress for rent claimed to be due on the first day of November. The attempted rescission was based upon a charge that the three agreements were procured by fraud of De-Crette. The fraud alleged was that the landlord had, before the execution of the first agreement, requested of DeCrette a statement of all his outstanding debts, and that DeCrette had furnished the statement and had assured the landlord that it contained a complete list of all his creditors and debts. The statement did not include the outstanding mortgage debt of DeCrette, which was secured by a mortgage lien on the equipment of his place of business and, not having actual knowledge of its existence, the landlord was induced

by the tenant's misrepresentation to execute the three agreements mentioned. DeCrette's reply to this accusation is that he was simply asked for a list of those creditors who were pressing him for payment, and that he did not mention the mortgage debt because he believed the landlord knew of it and he did not regard the obligation as coming within the meaning of a pressing debt, since he had paid the installments of the mortgage debt as they had fallen due every month. But the landlord offered proof in support of its charge and, accepting the misrepresentation and its materiality as established, the question whether the owner had the right to distrain nevertheless remains.

1. Rent is a demand of high nature. If a tenant makes default in its payment, the landlord has a remedy for its recovery by action or by distress. *Venable's Syllabus of Law of Real Property,* 46; Code, art. 53, secs. 9, 11. In the settlement of a decedent's estate, after taxes due and in arrear, claims for rent in arrear against the decedent, for which a distress might be levied by law, are preferred debts. Code, art. 93, secs. 120, 91, 92. And there is a further statutory provision that the lien of any landlord upon goods or chattels for the satisfaction or security of rent due or accruing shall not in any way be affected or postponed by a vendor's lien upon personalty under section 31 of article 66 of the Code. And in five counties of the state, where the rent reserved is a share of a growing crop, or, when the rent is so reserved, the landlord has made advances upon the faith of the crop to be grown, the rent reserved or advance made is by statute declared to be a lien on such crop, which shall not be divested by a sale made by the tenant or by his insolvency or by process of law issued against the tenant. Code, art. 53, secs. 23, 24; *Hopper v. Haines,* 71 Md. 64. In the event the tenant should remove from the demised premises, within sixty days prior to or subsequent to the time when the rent has or will become due, property belonging to the tenant at the time of its removal, it is made lawful by statute for the landlord to follow, seize, and sell such

property under distress for the rent due at any time within sixty days after the time when the rent becomes due, provided that such property shall not have been sold to a *bona fide* purchaser without notice or taken in execution. Code, art. 53, sec. 19; *Gaither v. Stockbridge,* 67 Md. 228; *Burnett v. Bealmear,* 79 Md. 38; *Dorsey v. Hays,* 7 H. & J. 370. See 2 *Coe's Alexander's British Statutes,* pp. 994-996.

And, finally, it is well settled that goods levied upon under a writ of *fieri facias* or otherwise in the custody of the law cannot be distrained for rent in arrear, so, to avoid the injurious operation against landlords of this common law rule because of their loss of the right of distress when the goods on the premises of their tenants were seized under an execution, the Statute of 8 Anne, ch. 14, sec. 1, was enacted. This statute is in force in Maryland. It was styled "An act for the better security of rents, and to prevent frauds committed by tenants," and the enactment is: "For the more easy and effective recovery of rents reserved in leases, * * * no goods or chattels whatsoever lying or being in or upon any messuage, lands or tenements, which are or shall be leased for life or lives, term of years, at will or otherwise, shall be liable to be taken by virtue of any execution on any pretense whatsoever, unless the party at whose suit the said execution is sued out, shall before the removal of such goods from off the said premises, by virtue of such execution or extent, pay to the landlord of the said premises, or his bailiff, all such sum or sums of money as are or shall be due for rent for the said premises at the time of the taking such goods or chattels by virtue of such execution; provided the said arrears of rent do not amount to more than one year's rent, and in case the said arrears shall exceed one year's rent, then the said party, at whose suit such execution is sued out, paying the said landlord, or his bailiff, one year's rent, may proceed to execute his judgment as he might have done before the making of this act; and the sheriff or other officer is hereby empowered and required to levy and pay to the plaintiff as well the money so paid for rent, as the execution-

money." 2 *Coe's Alexander's British Statutes,* pp. 921, 924-929.

It is this statute which the appellant argues creates such a lien before a distress has been levied that it will be preserved for the benefit of the landlord, although the three paper writings are not rescinded. The complete answer to this contention is that the statute plainly does not create a lien of any kind unless and until an execution or attachment is levied upon goods or chattels of the tenant located on the demised premises and subject to the distress for rent in arrear. Code, art. 53, sec. 22; *Washington v. Williamson,* 23 Md. 244, 251, 252; *Gaither v. Stockbridge,* 67 Md. 222, 228; *Buckey v. Snouffer,* 10 Md. 149, 155; 2 *Poe, Pl. & Pr.,* secs. 632-638; *Rotherey v. Wood,* 3 Camp. 24; *Cloud v. Needles,* 6 Md. 504.

In construing the statute it was held that an attachment on warrant is not an execution within the meaning of the act, for the reason that an attachment is but *mesne* process, liable at any time to be dissolved, and the judgment upon which may or may not affect the goods or chattels seized, while the execution contemplated by the statute is a judicial process for obtaining the debt or damages recovered by a judgment that is final in its nature. Nevertheless, it was observed by Le Grand, J., at *nisi prius,* in *Fisher v. Johnson,* 6 Gill, 354, 360, 361, that the execution issued to enforce the judgment of condemnation obtained under an attachment is an execution within the purview of the Statute of Anne, but *Thompson v. Baltimore & Susquehanna Steam Co.,* 33 Md. 312, did not so hold. In that case the goods of a tenant were seized and sold by the sheriff, without paying the arrears of rent due the landlord, after notice given the sheriff under the Statute of Anne. The goods were perishable, and, for the purpose of preventing a loss pending the attachment, the court passed an order requiring a sale, so that the proceeds should remain subject to the final judgment of the court. In an action against the sheriff by the landlord for making the sale and removing the goods without securing the landlord his rent, it was pointed out that

by a seizure of property under an attachment the sheriff or other officer has no power to sell the property seized, unless by the express order of the court, and so an attachment was not an execution within the meaning of the Statute of Anne, and, moreover, the sheriff, acting under the order of competent authority, was fully justified and protected by the court's order to sell. But, although our predecessors held that the sheriff "can neither be held liable for selling the property before judgment of condemnation under an order of court, nor after such judgment under a *fieri facias* issued thereon," it also declared that, as the seizure under the attachment placed the goods in the custody of the law, and as their seizure and condemnation under the attachment, followed by execution, might deprive the landlord of his remedy by distress, if there be not sufficient goods left remaining to satisfy his demand, as effectually as if there had been an execution, he should be allowed, in view of the similarity of the two proceedings, and of their ultimate effect on the landlord, to come in and claim for such an amount of rent in arrear as he could have legally demanded if the goods had been taken on execution, and, if such demand be properly established, it will take precedence of the debt or claim for which the attachment issued, and, out of the proceeds of the property condemned, will be entitled to be first paid. *Supra,* p. 319. See *Dixon v. Smith,* 1 Swanst. 457, 36 Eng. Reprint, 464 (sequestration).

The appropriation of the goods attached after judgment of condemnation is accomplished by a writ of execution and the exclusion of an attachment from the Statute of Anne was on technical grounds, and, in presenting its reasons for deciding that the landlord was not without remedy, because he came "within the equity of the statute," this court remarked that "the landlord has a *quasi* lien on the goods of his tenant subject to distress, even before distress levied, for arrearages of rent." *Thompson v. Baltimore & Susquehanna Steam Co.,* 33 Md. 319. See *Wanamaker v. Bowes,* 36 Md. 42, 59; *White v. Hoeninghaus and Curtess,* 74 Md. 127, 129, 130; *Gaither v. Stockbridge,* 67 Md. 222, 228.

But a *quasi* lien, in the sense used in *Thompson v. Baltimore etc. Co., supra,* and the other cases cited, means nothing more than the potential right of a landlord to subject to distress the goods and chattels on the demised property for the rent in arrear. See *Degner v. Baltimore,* 74 Md. 144, 147. This potential right does not become a lien upon the goods and chattels on the leasehold property until the goods and chattels are actually seized under a distress (*Buckey v. Snouffer,* 10 Md. 149, 155; *Gelston v. Rullman,* 15 Md. 260, 264, 268; *Keller v. Weber & Doerner,* 27 Md. 660, 664, 666; *Fox v. Merfeld,* 81 Md. 80, 82), or until the conditions of the statute otherwise making the rent a lien without a seizure under distress are fulfilled. *Supra.* The only statutes in Maryland converting this *quasi* lien at common law to a lien before a seizure by distress are sections 23 and 24 of article 53 of the Code, and the provisions quoted of the Statute of Anne. Sections 23 and 24 are, of course, inapplicable, as they relate to advances by landlords on crops and crop rents reserved in but five counties. Nor was any lien obtained under the Statute of Anne, as there was no levy and seizure of the goods and chattels under either a *fieri facias* or attachment, but the purporting landlord had seized the goods and chattels under a distress. For the *quasi* lien of the landlord to become a lien to the extent of one year's rent in arrear upon any goods and chattels under section 1 of the Statute of Anne, such goods and chattels must be first seized under a *fieri facias,* or under a writ of attachment. If the seizure be under an execution, the lien is upon the goods seized, and is not discharged until the rent in arrears for not more than one year is paid; but if the seizure be by way of attachment, the *quasi* lien follows the personalty, so as to become a preferential demand enforceable as a prior claim against the proceeds of a sale of the goods and chattels attached under a writ of *fieri facias.* *Supra;* and see cases cited in notes to Statute of Anne in Coe's Alexander's British Statutes, pp. 924-929; *Degner v. Baltimore,* 74 Md. 150, 151; *Buckey v. Snouffer,* 10 Md. 149, 155. Consequently the conditions do not exist in this case for any lien

to arise under section 1 of the Statute of Anne, and so none can be assumed to exist, unless it be by virtue of the distress and seizure of the goods and chattels on November 27th, 1927.

2. At common law there was no right of distress after the expiration of the term, even though the tenant still retained possession, because there was no longer any privity between the tenant and his former landlord. So, no distress could be made at common law for rent falling due on the last day of the term, since the rent was not in arrear until midnight of that day. To relieve the landlord in this situation, the common law was changed by Statute of 8 Anne, ch. 14, secs. 6, 7, which is in force in Maryland. 2 *Tiffany, Landlord & Tenant,* sec. 326, pp. 1993, 1994; 2 *Coe's Alexander's British Statutes,* 923, 930. This statute declared it "to be lawful for any person or persons having any rent in arrear or due upon any lease for life or lives, for years or at will, ended or determined, to distrain for such arrears, after the determination of the said respective leases, in the same manner as they might have done, if said lease or leases had not been ended or determined, * * * provided that such distress be made within the space of six calendar months after the determination of such lease, and during the continuance of such landlord's title and interest, and during the possession of the tenant from whom such arrears became due."

In the first place, it will be observed that the statute only authorizes the distress after the term is "ended or determined," which has been held to mean by lapse of time, and, probably, by notice to quit, but not where the term is ended by the enforcement of a forfeiture by the landlord for breach of condition (*Grimwood v. Moss,* L. R. 7 C. P. 360, 365; *Doe d. David v. Williams,* 7 Car. & P. 322); nor after a tenant has surrendered his leasehold interest to the landlord, since the relation of tenancy must exist to support a distress. *Tiffany, Landlord & Tenant,* sec. 326, pp. 1995, 1996; *Bain v. Clark,* 10 Johns. (N. Y.), 424. See *Coupland v. Maynard,* 12 East 134; *Halsbury's Laws of England,* title *"Distress,"* sec. 270, p. 150; *Lewis v. Davies* (1914), 2 K. B. 469; *Bain*

*v. Clark,* 10 Johns. (N. Y.) 424; *Biggs v. Stueler,* 93 Md. 100, 111; *Dailey v. Grimes,* 27 Md. 440. See *Cahill v. Lee,* 55 Md. 319, 324, 325. Again, the distress must be made on the premises and during the possession of the tenant. The continuance of the possession need not be tortious, and is not confined to a holding over of the whole of the premises. *Nutall v. Staunton* (1825), 4 B. & C. 51, 107 Eng. Rep. 978; *Turner v. Barnes* (1862), 2 B. & S. 435, 121 Eng. Rep. 1135; *Taylerson v. Peters* (1837), 7 Ad. & El. 110, 114, 112 Eng. Rep. 412; *Gray v. Stait* (1883), 11 Q. B. Div. 668, 673; *Wilkenson v. Peel* (1895), 1 Q. B. 516; *Cox v. Leigh,* L. R. 9 Q. B. 333; *Williams v. Stevens,* 9 Q. B. 14, 115 Eng. Rep. 1181; *Braithwaite v. Cooksey,* 1 H. Bl. 465, 126 Eng. Rep. 269; *Poole v. Longuevil,* 2 Saund. 284, n. 2, 85 Eng. Rep. 1065; *Duppa v. Mayo,* 1 Saund. 287, n. 16, 85 Eng. Rep. 374. And this possession by the tenant after the determination of the term is evidenced by the keeping of the premises as the tenant's own, to the exclusion of other people. 11 *Halsbury's Laws of England,* title *"Distress,"* sec. 270, pp. 150, 151; 2 *Coe's Alexander's British Statutes,* pp. 930, 931.

It should be noted that the statute does not apply where by agreement or the custom of the country the interest and connection between the landlord and the tenant is extended beyond the term, and for this purpose the possession of the tenant is allowed to continue. The tenancy is by such custom or agreement so far prolonged during such further possession as to allow the landlord to distrain. *Supra.* So, a distress may be had where the custom was for an outgoing tenant to leave his awaygoing crop in the barn of a farm; or where the tenant was allowed to continue possession to thrash his wheat; or where the outgoing tenant was entitled to a share of the crop sown during his tenancy and the custom was for him to cut the crop and save it. *Supra;* and *Beavan v. Delabey* (1788), 1 Hy. Bl. 5, 126 Eng. Rep. 3; *Lewis v. Harris* (1778), 1 Hy. Bl. 7, note; *Baraston v. Green* (1812), 16 East. 71; *Knight v. Bennett* (1826), 3 Bing. 364, 130 Eng. Rep. 1552; *Griffiths v. Puleston* (1844), 13 M. & W. 358; *Re Powers, Mainsty v. Archdale* (1890), 63 L. T. 626; *Nuttal*

*v. Staunton* (1825), 4 B. & C. 51; *Poole v. Longuevil,* 2 Saund. 284, n. 2, 85 Eng. Rep. 1065; *Coe's Alexander's British Statutes,* pp. 930, 931. See *Dorsey v. Eagle,* 7 G. & J. 321; *Bevans v. Briscoe,* 4 H. & J. 101; *Dircks v. Brant,* 56 Md. 500; *Woodfall's Landlord & Tenant* (21st ed.), 537, 579, 580, 583.

The effect of the agreement of July 15th, 1924, was to extend the time for the payment of the rent then due and to become due until the first day of October, 1924, and to assign all the personal property and fixtures of the tenant to the landlord, with the provision that the latter's title to the property so transferred would be defeated if, at the expiration of the lease by effluxion of time or otherwise, the rent shall have been paid in full and all the covenants of the lease shall have been performed. The paper writing under seal of the parties, under date of September 30th, 1924, was a surrender of the term, a vacation of the premises, and a delivery of all the personal property on the premises by the tenant to the landlord; and, also, a formal acceptance of the surrender by the landlord, and a release and discharge by it for all rent due by the tenant. The execution of this surrender and release was followed by the actual relinquishment of possession by the tenant to the owner of the reversion and by the landlord taking actual possession of the premises and personalty as owner and employing its former tenant as its agent to conduct temporarily the cafeteria business on the premises for the benefit of the owner. *Supra;* and *Lamar v. McNamee,* 10 G. & J. 116; *Kinsey v. Minnick,* 43 Md. 121; *Biggs v. Stueler,* 93 Md. 100, 110-112; *Oldewurtel v. Wiesenfeld,* 97 Md. 165, 176; *Neale v. Clautice,* 7 H. & J. 372, 380; *Howard v. Ramsay,* 7 H. & J. 113, 122, 123.

The three sealed instruments were fully executed, and hence the term did not end by effluxion of time, but by a surrender and acceptance, and the seizure of the goods by distress was not during the possession of the tenant. So long as these three documents remained operative, a distress was not possible under sections 6 and 7 of the Statute of 8 Anne, nor authorized by law or statute. The owner endeavored to

remove the obstacle to distress by an attempted rescission of the three sealed paper writings for fraud.

3. It was the owner's theory that, if the sealed instruments were rescinded, the extinct leasehold estate would be revived, with all its incidents, and that as landlord under the surrendered leasehold the owner could collect by distress the rent which it had formally released. *Swartz v. Brewing Co.,* 109 Md. 393. The full and voluntary performance of the three sealed contracts before the discovery by the owner of the facts giving rise to the right to rescind for fraud or misrepresentation will not prevent a rescission at law by notifying the other party of the owner's intention to avoid the documents, provided the owner has not waived the right by his conduct and the tenant can be put *in statu quo,* and that no adverse rights of innocent third parties have intervened. *Wald's Pollock on Contracts* (3rd ed. Williston), pp. 705-706, 712-721; *Foley v. Crow,* 37 Md. 51, 62; *Latrobe v. Dietrich,* 114 Md. 8, 21; *Findlay v. Baltimore Trust Company,* 97 Md. 716, 720, 724. The reason for this general rule is that a fraudulent contract is usually valid until repudiated, and so the repudiation may become impossible, as where the parties cannot be restored to their original *status quo* or the rights of third parties have intervened. *Bower on Actionable Misrepresentation,* pp. 245, 246, 271-273; 3 *Williston on Contracts,* sec. 1529, p. 2719; *Snell's Equity* (15th ed.), 450, 451; *Lagunas Nitrate Co. v. Lagunas Syndicale* (1899), 2 Ch. 392; *Fry on Specific Performance* (6th ed.), sec. 734, *et seq.; Oakes v. Turquand,* L. R. 2 H. L. 325; *Mixer's Case,* 4 De G. & J. 575.

In the instant case, the party misled accepted the surrender of the leasehold estate and took possession of the equipment of its former tenant, and then later, after protracted negotiation, sold the personalty to innocent purchasers for value, and demised the surrendered premises for a new term of five years to these purchasers. By these acts of ownership with respect to the personalty and the premises, the party misled has dealt with the subject matter of the lease in such

a manner as to make a restoration of the *status quo* impossible. The rights of the innocent purchasers, and the estate of the lessees under the new lease, are alike indefeasible, since they were both acquired in good faith and for value. Furthermore, the owner made no attempt at restitution after its discovery of the misrepresentation. The Washington parties had paid the money on account of the purchase of the personalty and had, with the owner, executed the lease on the morning of November 17th, and only a few hours before the discovery of the fraud. The owner did not refund to these innocent third parties the money it had received, and request from them a cancellation of the new lease, creating a term which would not begin until January 15th, 1925. On the contrary, the owner, asserting the right to make the lease but recognizing that the chattel mortgage affected its agreement to sell the chattels, obtained an agreement from the buyers that they would accept the change in the situation caused by the mortgage, on the promise of the owner to protect them against loss. Moreover, the new lessees were given possession of the premises at the beginning of the new term on January 15th, 1925, and are now in the full enjoyment of their leasehold estate. Nor can this present holding of the new tenants be imputed to that provision of the lease with DeCrette that "in case of non-payment of rent or in case the leased premises shall be deserted or vacated, lessor shall have the right to enter the same * * * . and also to relet the said premises as agent of lessee for any unexpired balance of the term and receive the rent therefor," since the company leased to the new parties as owner and not as the agent of DeCrette, and did not let for any unexpired balance of DeCrette's term of five years, ending on September 30th, 1926, but for a wholly new and distinct term beginning on January 15th, 1925, and ending on January 14th, 1930. Moreover, a complete answer to any argument that the lease to the Washington parties was in execution of this power in the DeCrette lease is found in the fact that the second lease was executed at a time when

the estate of DeCrette had ended by its surrender and acceptance and all rent from him had been released, and after the owner had conducted the cafeteria on the premises as its own enterprise, and before the three instruments were repudiated or the lessor was aware of the misrepresentation now charged to DeCrette. The president of the owner stated in his testimony that at no time after November 17th was DeCrette claimed by the company to be a tenant. See *Biggs v. Stueler*, 93 Md. 100, 110-112.

On the facts of this record it clearly appears that the Calvert Company, although misled and, before November 17th, acting in ignorance of the misrepresentation, has by its own course made it impossible for it to restore the *status quo* of DeCrette because of the intervening rights and estate of innocent lessees for value. If we accept in full the theory of the owner as to the effect of its attempted rescission, DeCrette, by paying or tendering all the rent in arrear at the time of the distress, would have been entitled to a resumption of his tenancy and a full restoration of the chattels, and yet this restoration was beyond the power of the owner because of the valid intervening leasehold estate created by the owner in third parties and the sale to them of the personalty, both transactions being for value and without notice to them. *Supra; Fry on Specific Performance* (6th Ed.), sec. 742. It follows that the conditions for a rescission do not exist, since it is a limitation upon the right that it may not be exercised where it has become impossible to restore the parties to the position in which they would have been if the contract, surrender and release had not been made, or where third persons have in good faith and for value acquired an interest in the subject matter of the contracts and in the surrendered leasehold estate. Under these circumstances, the party misled is remitted to an action at law for whatever injury may have been sustained by reason of the alleged misrepresentation. The primary purpose in permitting a rescission as an alternative to an action at law for damages is to restore the parties to their original

position by undoing all that has intervened between it and the rescission. One of the derivative rules from this principle is that the rescission must be mutual, since it would be most inequitable that one party and not the other should be reinstated. So, to allow the transient revival of the relation of landlord and tenant by a rescission of the surrender of the term and the release of the rent in order to enable the landlord to collect rent in arrear, when there is no possibility of the tenant's rights and estate in the unexpired term being restored, would be violative of the principle upon which rescission is grounded. It necessarily follows that the former landlord's right to distress was at an end, and that no claim for rent can be allowed against the proceeds of the chattels sold by the trustee.

4. The tenant DeCrette conducted a lunch room, and the chattels in question were all the fixtures, appliances, furniture, machinery, and equipment installed and used by the tenant in the carrying on of that business. None of these articles is shown to have been a part of a stock of goods, wares, and merchandise in which it was the business of the proprietor of the lunch room to deal. The equipment of the restaurant was not bought and sold in the course of trade. The traffic in which the proprietor was engaged was the purchase of edibles and the accessories of the table, and selling them to patrons when converted into food and served with meals. Whatever supplies he carried for this purpose constituted a "stock of goods, wares and merchandise," within the meaning of the Sales in Bulk Act (Code, art. 83, secs. 100-104), and if he sold such a stock, together with his equipment, unquestionably the entire sale would have been void, upon the authority of *Sakelos v. Hutchinson Bros.,* 129 Md. 300. Compare 12 *R. C. L.,* p. 527; *Williston on Sales* (2nd Ed.), sec. 643; 7 *A. L. R.* 1588, note.

In the agreement of September 30th DeCrette delivered to the landlord, in fulfilment of their contract, the personal property in and on the premises, and this would include his stock for sale as food and its accessories, and the sale would

be within the decision in *Sakelos v. Hutchinson Bros.* Moreover, the reasoning and conclusion in that case proceeds upon the theory that it was the intention of the Legislature to prevent the perpetration of fraud on the creditors of those engaged in all kinds of business, and that the statute should be given a liberal construction so as not to restrict its beneficial operation. This view is supported by section 102, which declares that, whenever by a sale or transfer "substantially the entire business trade theretofore conducted by the vendor shall be sold or conveyed, or attempted to be sold or conveyed, to one or more persons," it "shall be deemed a sale or transfer in bulk in contemplation of this law."

In the instant case, the entire restaurant business, including lease and equipment of all kinds, was sold or transferred to the landlord, and we are constrained by the authority of *Sakelos v. Hutchinson Bros., supra,* to hold the transaction void as to any and all then subsisting creditors of DeCrette, among whom were the J. L. Appleby Company and the Clover Dairy, since the provisions of sections 100 and 101 of article 83 of the Sales in Bulk Act, requiring the seller to furnish the buyer with a written statement under oath of the names and addresses of all his creditors, with the amount of every debt, or of the fact that he has no debts, and the buyer to give notice to the listed creditors pursuant to the requirements of the statute, were not complied with.

If it were not for the cited statute making the transfer or sale to the Calvert Company void, the residue of the fund, after the payment of the mortgage debt, would be distributed to the Calvert Company, but the effect of the statute is to make this residue a fund for the benefit of the subsisting creditors of DeCrette on September 30th, 1924. The proceedings instituted in the pending cause by the J. L. Appleby Company on January 7th, 1925, was based in part on the invalidity of the sale or transfer of the chattels to the Calvert Company and on the allegation that DeCrette had no other assets, so this residue cannot be diverted from the general creditors by subsequent attachment.

The transaction with the Calvert Company is not avoided for actual fraud, but in consequence of a failure to observe the statutory requirements, and the company is entitled to participate *pari passu* in the distribution of the residue as one of the subsisting creditors, on account of its claim for rent in arrear on September 30th, as well as the Appleby Company and Clover Dairy, and such other creditors as may come in, after the usual notice is given, on the remand of this cause, to those creditors of DeCrette who come within the class contemplated by the Sales in Bulk Act. *Miller's Equity,* sec. 377, and notes; *Hammond v. Hammond,* 2 Bland, 306, 346.

The only error in the chancellor's decree is that, after deducting the amount he found due on the mortgage debt, he failed to direct a distribution of the residue among all subsisting creditors of DeCrette as of September 30th, 1924, after the publication of the usual notice to file their claims in court. For this reason, the cause will have to be remanded.

> *Decree affirmed in part and reversed in part, and cause remanded for further proceedings in conformity with this opinion. One-half of the costs to be paid by the Calvert Construction Company, one-fourth by George Waldhauser, trading as The Clover Dairy, and one-fourth to be paid out of the residue for distribution among the general creditors.*