JOHANNA FARMS, INC. *v.* ELLIOTT EQUIPMENT
COMPANY, INC.

[No. 157, September Term, 1975.]

*Decided July 13, 1976.*

138

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Broughton M. Earnest,* with whom were *Goldsborough, Franch & Collett* on the brief, for appellant.

No brief filed on behalf of appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that a trial judge (Clark, J.) correctly concluded that by reason of the failure of a transferee and a transferor to do that which was required in the case of a bulk transfer under what was then Maryland Code (1957, 1964 Repl. Vol.) Art. 95B, §§ 6-104 — 6-107, inclusive, (now Code (1975) §§ 6-104 — 6-107 Commercial Law Article) a transfer was ineffective against a garageman who held a lien under then Code (1957) Art. 63, § 41 (now Code (1975) § 16-202 Commercial Law Article) for the repair of a vehicle.

Appellant, Johanna Farms, Inc. (Johanna Farms), brought an action in replevin in the District Court of Maryland for Talbot County against appellee, Elliott

Equipment Company, Inc. (Elliott), alleging that Elliott improperly detained a 1970 International tractor. Johanna claimed to be vested with title to the tractor by reason of a purchase from King Juices, Inc. (King Juices). In what state King Juices was incorporated does not appear. It is apparent, however, that its principal place of business was at Greensboro in Caroline County.

The vehicle in question had been repaired by Elliott for King Juices at sometime prior to April 25, 1974, having been damaged in an accident. The cost of the repairs was approximately $4,000. Elliott released the tractor upon the promise that it would be paid as soon as the check for the repairs was received from the insurance company involved.

Some time after April 25 Elliott received a form letter from Johanna Farms bearing that date on the stationery of King Juices. It said:

> "Gentlemen:
>
> "This is to advise you that as of April 26, 1974, Johanna Farms, Inc., has purchased the Maryland Plant, together with all equipment and rolling stock of King Juices, Inc., and Johanna Farms is taking over the operation of the plant and the service of the customers formally [sic] serviced by King Juices.
>
> "You are hereby advised, that Johanna Farms assumes no responsibility for accounts payable of King Juices, incurred prior to April 26, 1974. Billing for supplies on and after April 26, 1974, is to be made to King Juice Division of Johanna Farms and mailed to P. O. Box 246, Greensboro, Maryland 21639.
>
> "If you have any questions regarding the above, please contact the undersigned at Johanna Farms, Inc., P. O. Box 272, Flemington, New Jersey 08822. Telephone: (201) 782-4515.
>
> "For credit references, please feel free to contact the Flemington National Bank and Trust Company,

or the Town and Country Bank, both in Flemington, New Jersey.

Very truly yours,
PETER S. GOLDMAN"

On May 4 Johanna Farms delivered the tractor in question to Elliott's place of business in Easton for minor repairs, a change of oil, and a grease job. The total bill was $75.06. The repairs were charged to "King Juice, Greensboro, Maryland." Underneath appeared "Johanna Farms." On May 21 it was returned to Elliott's place of business for minor repairs. The bill in that instance was to "King Juice, Greensboro, Maryland," in the amount of $70.39. Nothing appears on the invoice relative to Johanna Farms. In each instance the vehicle was released without any mention being made of the sum of $4,000 still due for the previous repairs.

Sometime after its date of May 22, but before May 28, Elliott received a second form letter relative to this transfer. It was on the stationery of Johanna Farms and also was signed by Mr. Goldman. It said:

"Gentlemen:

"Recently we advised you that as of April 26, 1974, we had acquired the Greensboro, Maryland Plant of King Juices, Inc., and certain equipment and assets located therein and that prior to that date, we have no responsibility for any obligations of King Juices, Inc.

"We wish to further inform you that final arrangements between Johanna Farms, Inc. and King Juices, Inc. have not been concluded and that under our agreement with King Juices, Inc., any moneys not used to pay off creditors of King Juices, Inc. holding liens, will be paid in escrow to the attorney for King Juices, Inc., Alan Z. Lefkowitz (Kaplan, Finkel, Lefkowitz, Roth & Ostrow, Esqs., Suite 1612, Frick Building, Pittsburgh, Pennsylvania 15219) for payment of secured claims and distribution to creditors of King Juices, Inc., *in strict*

*compliance with the Uniform Commercial Code, if applicable.*

"We suggest you contact the attorney for King Juices, Inc.

> JOHANNA FARMS, INC.
> /s/ Peter S. Goldman
> Peter S. Goldman"

(Emphasis added.)

On May 28 the tractor was returned yet again to the shop of Elliott for repair. This work was completed on or about May 30 at a cost of $997. At this time Elliott declined to release the vehicle unless all bills for repairs to it were paid including the $4,000. This resulted in a telephone conversation between the general counsel for Johanna Farms and George Wilson, president of Elliott. The attorney said that the cash consideration for the bulk transfer had been paid to the attorney for King Juices in escrow for payment to the creditors of King Juices in accordance with their legal priorities and suggested that contact be made with the attorney for King Juices, Alan Z. Lefkowitz, Esq. Other conversations took place, including conversation between counsel for Elliott and counsel for Johanna Farms. Johanna Farms sent an individual to Easton for the tractor. Elliott declined to release the tractor unless the sums due it were paid. Judge Clark said of this:

> "It is to be noted that [the employee of Johanna Farms] did not offer to pay [Elliott] the $997.00 for the release of the tractor, nor did he have the funds with which to pay this bill or New Jersey tags to put on the tractor in the event it had been released to him."

The tags on the vehicle had expired May 31. It was actually titled in Pennsylvania in the name of Double X Products Company, which seems to have been a subsidiary or affiliate of King Juices. On or about June 13 Johanna drew a check to Elliott in the amount of $145.45 covering the May 4 and May 21 repair bills, which check was paid in due course. Elliott

received from Lefkowitz approximately one-third of the $4,000 owed for repairs to the tractor made before the bulk transfer. Elliott has never received the $997 for the repairs rendered May 28-30, 1974.

It is not disputed: that the tractor in question was a part of a bulk transfer within the meaning of Code (1957, 1964 Repl. Vol.) Art. 95B, § 6-102; that Elliott was not advised of the transfer of title from King Juices to Johanna; and that in the transfer no affidavit was procured from agents of King Juices as to debts owed by that corporation nor was there an affidavit to the effect that there were no debts.

The District Court action was docketed on November 4, 1974. Johanna claimed damages for the unlawful detention. Judgment was rendered on June 16, 1975, against Elliott in favor of Johanna in the amount of $7,364.49 covering cost of rental of a replacement tractor.

An appeal was filed to the Circuit Court for Talbot County. The amount in controversy having been in excess of $500, the "appeal [was] heard on the record made in the District Court." Code (1974) § 12-401 (c) Courts and Judicial Proceedings Article. The circuit court judge pointed out that no effort was made to comply with the requirements for scheduling of property and listing of creditors as required by Art. 95B, § 6-104; that the two letters to which we have referred "do not contain in several material respects the information required by § 6-107 and such notice could not have been timely sent, as [Johanna] was in possession of subject tractor on 4 May 1974 when [Johanna] turned it over to [Elliott] for repairs, yet the first notice of the bulk transfer was dated 25 April 1974, a lapse of only nine days, assuming it was sent on that date and possession of subject tractor was not delivered to [Johanna] until 4 May 1974"; said that "[e]ven though it may be assumed that none of the purchase money fell into the hands of the transferor and all of it was devoted to the payment of the transferor's debts, how can it be assumed that each and every creditor of the transferor was dealt with fairly and in accordance with law, when it is undisputed that the transferee ignored the

requirements of § 6-104 and § 6-107, which are two of the most important provisions of Title 6?"; concluded that "[t]he failure of the parties to the bulk transfer to abide by the provisions of Title 6 was so flagrant as to persuade one that they had never read them"; "uph[e]ld Elliott's refusal to release that tractor"; "noted that the [District Court] judgment does not state that [Johanna] is entitled to the return of subject vehicle and, lacking such a predicate, it is difficult to see how [Johanna] could be awarded damages for [Elliott's] unlawful detention of subject vehicle"; that "the judgment is inconsistent with the Opinion of the District Court, holding that [Elliott] was entitled to recover from [Johanna] the sum of $1,032.65 for services properly performed by [Elliott] for [Johanna] at the latter's request in that no deduction of this amount was made from the award of damages to [Johanna]," and proceeded to reverse the judgment in favor of Johanna and enter one for Elliott against Johanna in the amount of $1,032.65 and all costs.

We granted the writ of certiorari in this case in order that we might consider the question presented under the bulk transfer provisions (Subtitle 6) of the Uniform Commercial Code, Art. 95B at the time the cause of action arose and now the Commercial Law Article. Our predecessors rendered decisions relative to the failure of parties to comply with the prior Maryland sales in bulk act (Code (1957) Art. 83, § § 97-101) but we have not been called upon to render any decision relative to failure to comply with the present bulk transfer statute.

Johanna sees this case as having two questions, (1) whether it "substantially complied with the provisions of the Bulk Sales Act," and (2) whether Elliott is "barred by the statute of limitations from challenging the legality of a bulk sales transfer."

i

### The Bulk Sales Transfer

The garageman's lien claimed by Elliott arises under what

at the time of this transaction was Code (1957) Art. 63, § 41 providing in pertinent part:

"Whenever a motor vehicle . . . is left by the owner or by any other person with his authority, express or implied, in the custody of any corporation, . . . for repair, . . . the corporation . . . in whose custody said motor vehicle . . . is left for all or any of the purposes aforesaid, shall have a lien on said motor vehicle . . . for all charges so incurred, and may lawfully retain the same until said charges have been paid, or until said lien is extinguished or discharged as hereinafter provided. Said lien shall be superior to the rights of the holders of conditional sale contracts, bills of sale, chattel mortgages or other liens or claims of any kind which are not theretofore executed and recorded or filed for record as required by law, but shall be subordinate thereto where the same have been theretofore executed and recorded as required by law. Surrender or delivery of any motor vehicle subject to the lien aforesaid shall operate as a waiver or extinguishment of the same as against third persons without notice thereof, but shall not operate as such waiver or extinguishment as against the owner or as against third persons with notice."

The applicable provisions relative to bulk transfers are found in Code (1957, 1964 Repl. Vol.) Art. 95B, subtitle 6. By § 6-102 (1) a "bulk transfer" is defined as "any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or other inventory (§ 9-109) of an enterprise subject to th[at] subtitle." Johanna concedes that the transfer here was subject to the subtitle. Under § 6-104 (1) a bulk transfer subject to that subtitle "is ineffective against any creditor of the transferor" unless:

"(a) The transferee requires the transferor to

furnish a list of his existing creditors prepared as stated in this section; and

"(b) The parties prepare a schedule of the property transferred sufficient to identify it; and

"(c) The transferee preserves the list and schedule for six months next following the transfer and permits inspection of either or both and copying therefrom at all reasonable hours by any creditor of the transferor, or files the list and schedule in the office of the clerk of the circuit court in the county, . . . in which the property was located at the time of transfer."

By § 6-104 (2) the list of creditors is required to be "signed and sworn to or affirmed by the transferor or his agent" and to "contain the names and business addresses of all creditors of the transferor, with the amounts when known, and also the names of all persons who are known to the transferor to assert claims against him even though such claims are disputed." Responsibility for accuracy is placed on the transferor. Under § 6-104 (3) "the transfer is not rendered ineffective by errors or omissions therein unless the transferee is shown to have had knowledge." By § 6-105 a transfer other than one made by auction sale is said to be "ineffective against any creditor of the transferor unless at least ten days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer in the manner and to the persons . . . provided" in § 6-107, that requirement being "[i]n addition to the requirements of" § 6-104. Relative to the application of the proceeds § 6-106 provides that "[i]n addition to the requirements of the two preceding sections" if there is a bulk transfer subject to the subtitle for which new consideration is paid (other than a sale made at auction) "it is the duty of the transferee to assure that such consideration is applied so far as necessary to pay those debts of the transferor which are either shown on the list furnished by the transferor (§ 6-104) or filed in writing in the place stated in the notice (§ 6-107) within thirty days

after the mailing of such notice." It further provides that "[t]his duty of the transferee runs to all the holders of such debts, and may be enforced by any of them for the benefit of all." In the case of a disputed debt "the necessary sum may be withheld from distribution until the dispute is settled or adjudicated." If the consideration paid "is not enough to pay all of the said debts in full distribution shall be made pro rata." The transferee is protected by the further provision that he "may within ten days after he takes possession of the goods file a petition in the circuit court for the county in which the place of business of the transferor is situated . . . and pay the consideration into such court asking that a receiver . . . be appointed by said court to take charge of the distribution of the agreed purchase price and the transferee may discharge his duty under th[at] section by giving notice by registered or certified mail to all the persons to whom the duty runs that the consideration has been paid into that court and that they should file their claims there." Further provision is made for a receiver, upon qualification, to "be entitled to the custody and distribution of the agreed purchase price under orders of the court as in other receiverships." Notice requirements are contained in § 6-107 which provides:

"(1) The notice to creditors (§ 6-105) shall state:

"(a) That a bulk transfer is about to be made; and

"(b) The names and business addresses of the transferor and transferee, and all other business names and addresses used by the transferor within three years last past so far as known to the transferee; and

"(c) Whether or not all the debts of the transferor are to be paid in full as they fall due as a result of the transaction, and if so, the address to which creditors should send their bills.

"(2) If the debts of the transferor are not to be paid in full as they fall due or if the transferee is

in doubt on that point then the notice shall state further:

"(a) The location and general description of the property to be transferred and the estimated total of the transferor's debts;

"(b) The address where the schedule of property and list of creditors (§ 6-104) may be inspected;

"(c) Whether the transfer is to pay existing debts and if so the amount of such debts and to whom owing;

"(d) Whether the transfer is for new consideration and if so the amount of such consideration and the time and place of payment; and

"(e) If for new consideration the time and place where creditors of the transferor are to file their claims.

"(3) The notice in any case shall be delivered personally or sent by registered or certified mail to all the persons shown on the list of creditors furnished by the transferor (§ 6-104) and to all other persons who are known to the transferee to hold or assert claims against the transferor."

Creditors entitled to protection are said by § 6-109 to be "those holding claims based on transactions or events occurring before the bulk transfer, but creditors who become such after notice to creditors is given . . . are not entitled to notice."

Johanna talks in terms of there having been "substantial compliance" with the statute, possibly because funds here were said to have been paid to an attorney in escrow. However, if Johanna required King Juices to furnish a list of creditors and otherwise comply with § 6-104, that fact does not appear in the record. The letter of April 25 to the effect that Johanna was taking over King Juices on April 26 does not obey the mandate of § 6-105 that notice be given 10 days before the taking of possession. There ap-

pears to have been no notice complying with the provisions of § 6-107.

The command of § 6-104 is that the transfer shall be ineffective against a creditor of the transferor (which Elliott was) unless the schedules there specified are supplied, while § 6-105 provides that such a transfer shall be ineffective against any creditor unless the notice required by § 6-107 is given by the transferee, Johanna in this instance. There was noncompliance with both sections.

Our prior statute, Code (1957) Art. 83, §§ 97-101 (repealed "effective at 12:01 a.m. on February 1, 1964," by Chapter 538 of the Acts of 1963 when Art. 95B became effective) provided in § 98 that failure to comply with its provisions would render the sale "fraudulent and void as to subsisting creditors . . . ." Although the word "fraudulent" carries an unpleasant connotation this language is little different from saying that the transfer shall be "ineffective." Our predecessors in *Calvert Bldg. & Const. Co. v. Winakur*, 154 Md. 519, 539, 141 A. 355 (1928), and *Sakelos v. Hutchinson Bros.*, 129 Md. 300, 304, 99 A. 357 (1916), flatly held sales void where made in disregard of that statute. Similar holdings under the Uniform Commercial Code are found in *Danning v. Daylin, Inc.*, 488 F. 2d 185, 189 (9th Cir. 1973); *McKissick v. Foremost-McKesson, Inc.*, 441 F. 2d 811, 815 (5th Cir. 1971); *Pastimes Publishing Co. v. Advertising Displays*, 6 Ill. App. 3d 414, 417, 286 N.E.2d 19 (1st D. 1972); and *Starman v. Wolfe*, 490 S.W.2d 377, 385 (Mo. Ct. App., St. Louis D., Div. 2, 1973). A similar view is taken in W. Hawkland, *A Transactional Guide to the Uniform Commercial Code* § 3.0501 (1964); R. Anderson, *Uniform Commercial Code* § 6.104:10 (2d Ed. 1970), and Annot. UCC: Bulk Transfers, 47 A.L.R.3d 1114, 1140 (1973).

In this case there is no showing that the schedules required under § 6-104 were prepared nor is there any showing that all creditors were actually notified as required by §§ 6-105 and 6-107 — in fact, there is no showing that any creditors were notified. There is nothing to indicate that the pro rata share said to have been paid to Elliott was properly computed. We know nothing of the consideration.

Accordingly, we have no hesitancy in holding that the transfer was ineffective insofar as Elliott was concerned. Being ineffective in this instance means that when the vehicle was returned to Elliott that corporation was entitled to hold the vehicle under its lien since the earlier "[s]urrender or delivery of the motor vehicle subject to the lien . . . [does] not operate as [a] waiver or extinguishment against the owner or as against third persons with notice." Hence, Johanna was not entitled to recover in replevin against Elliott.

ii

### The Statute of Limitations

Johanna points to § 6-111 providing that "[n]o action under [the Bulk Transfers] subtitle shall be brought nor levy made more than six months after the date on which the transferee took possession of the goods unless the transfer has been concealed." It argues that "Elliott failed to 'bring any action' or invoke any 'levy' of execution within six months of the transfer of the vehicle," that it "did nothing more than employ self-help in unlawfully detaining the vehicle," a "type of vigilante approach . . . not sanctioned by the Bulk Sales Act or any other provisions of the law," and that "Elliott having failed to invoke the legal processes of the law in reference to the tractor within six months of the transfer, [it] was forever barred from challenging the legality of the transfer."

We take a somewhat different view. "Action" is defined in Art. 95B, § 1-201 as "in the sense of a judicial proceeding includ[ing] recoupment, counterclaim, set-off, suit in equity and other proceedings in which rights are determined." What is forbidden by § 6-111 is the bringing of some action or levy by Elliott to attack the transfer after the six month period has expired. In this instance Elliott had a lien and asserted that lien within weeks of the transfer. It declined in June, less than six weeks after the transfer, to release the vehicle because of its asserted lien. When Johanna brought a suit in replevin much later Elliott then defended upon the

basis of a lien which it had asserted months earlier. Thus, we do not find the limitation section applicable.

*Judgment affirmed; appellant to pay the costs.*