MANO SWARTZ *vs.* THE GOTTLIEB-BAUERN-SCHMIDT-STRAUS BREWING COMPANY.

*Goods of Third Party Taken Under Distraint for Rent—Right of Action of Owner Against Tenant—When Trover Lies—Measure of Damages.*

When the goods of a stranger found on rented premises are seized and sold under a distraint for rent against the tenant, the owner may buy the goods in at the sale, and recover the amount paid in an action against the tenant.

Certain property belonging to the plaintiff, and also property to which he was entitled under a chattel mortgage, was in the possession of a man who was a sub-tenant of the defendant, when this sub-tenant left the premises on which said property was and gave the keys to the defendant. After the plaintiff had demanded possession of the property and defendant had refused to give him the keys, the landlord issued a distress for rent against the defendant, under which plaintiff's property was seized and sold. *Held,* that the plaintiff is entitled to maintain an action of trover for his property, since plaintiff had demanded the same and been refused, and it was defendant's duty to protect plaintiff's goods from being taken for rent due by him.

*Held,* further, the measure of damages is the value of the goods at the time of the conversion, and in this case, the amount the goods sold for at auction under the distress proceedings is sufficient evidence of such value as against the defendant.

*Decided January 12th, 1909.*

Appeal from the Baltimore City Court (NILES, J.)

The trial Court gave the following additional instruction of its own motion:

If the jury find from all the evidence in the case that the premises Nos. 5, 7 and 9 E. German St. were leased by one Catherine T. O'Brien to defendant and sub-leased by the defendant to one Wm. G. Bolgiano, and if they shall further find that said O'Brien procured the distraint warrant mentioned in the evidence to be issued and the goods mentioned in the declaration to be sold thereunder, then:

1. If the jury find that the defendant had not accepted a surrender of the term of his sub-tenant Bolgiano, and again entered into possession of said premises prior to the issuance of said distraint warrant, their verdict must be for the defendant.

2. Even if the jury find that the defendant did accept a surrender of said term of his sub-tenant, and did again enter into possession of said premises prior to the issuing of said distraint warrant, still if the jury believe that prior to the issuance of said warrant there was no demand made upon said defendant by the plaintiff for a return of said goods, then their verdict must be for the defendant.

3. But if the jury shall find, from all the evidence that prior to the issuance of said distraint warrant, the defendant had accepted from his sub-tenant, Bolgiano, a surrender of all his interest in the said premises, and had himself entered again into possession thereof, and shall further find that prior to the issuance of said distraint warrant the plaintiff made demand upon the defendant for the delivery of said goods, and shall further find that the defendant either refused to

make such delivery to the plaintiff or induced said plaintiff to withdraw its demand for such delivery by false statements made with intent of inducing the plaintiff to allow said goods to remain upon the said premises until they should be distrained upon by the defendant's landlord on account of rent owing by the defendant, and if they shall further find that said goods were subsequently taken and sold under said distraint warrant, then the plaintiff is entitled to recover.

The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER, BURKE, THOMAS and WORTHINGTON, JJ.

*William S. Bayless* and *J. Marsh Matthews* (with whom was *Hyland P. Stewart* on the brief), for the appellant.

*Albert E. Donaldson* (with whom were *Robert Crain* and *O. F. Hershey* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee sued the appellant in *assumpsit*, upon six common counts, and filed therewith an account which read: "To rent of said Manuel Swartz due and owing for use and occupation of premises No. 8 E. German Street, Baltimore City, paid by distraint on the goods and chattels of said Gottlieb-Bauernschmidt-Straus Brewing Company * * * $360.00." The defendant filed the general issue pleas. The plaintiff asked leave to amend the declaration by striking out the six counts, to add an additional count, and to withdraw the account and affidavit filed with the original declaration. The Court granted leave to amend, and an amended declaration in *trover* was filed. The defendant filed the general issue plea, a jury was sworn, issue joined, and the case proceeded to trial, which resulted in a verdict for the plaintiff for $389.93 damages. From the judgment entered on that verdict, this appeal was taken.

The defendant objected to the amendment of the declaration, but as there was no exception taken to that action, it is

unnecessary to discuss it; although we might call attention to the fact that in *Bonaparte* v. *Clagett,* 78 Md. 87, this Court recognized the right of the plaintiff, who had sued in *assumpsit* upon the six common counts, to amend the form of action to *trover,* and decided that bringing the action in *assumpsit* did not constitute a ratification of the contract of sale which would prevent an action of *trover* for the value of the goods, where before judgment the plaintiff discovered that he had misconceived his remedy, and, upon an amendment allowed, changed the form of action to *trover.* The only exceptions in the record are to the granting of the plaintiff's *second* prayer, as modified, and the Court's own instruction, and to the rejection of the defendant's *first, second, third, fourth, sixth* and *seventh* prayers, and overruling the special exception to the plaintiff's *second.*

A somewhat full statement of the facts will be desirable in order that our conclusions on the rulings on the prayers may be properly understood. The defendant (appellant) rented from Mrs. O'Brien No. 8 East German Street, under two written leases. The first was for three years from November 1st, 1905, and included the property known as No. 8 E. German Street in the Phœnix Building, and the room under it, known as 7 Phœnix Building. The other was for three years from January 1st, 1905, and included rooms 3, 5, 7, and 9, which are in the basement of the Phœnix Building and are the rooms in which the property in question was distrained on. Swartz assigned his lease to those basement rooms to William G. Bolgiano for the remainder of the term, but the landlady, while permitting the assignment, refused to accept Bolgiano as tenant, or to release Swartz from liability under his lease. On October 18, 1906, Swartz was in arrears for his rent to Mrs. O'Brien in the sum of $400.00, and on that day a distress was levied on property found on the premises. The property so found was sold by the bailiff for $361.55, and, after deducting the costs, $295.37 was paid to the landlady on account of rent due her. On February 17, 1906, Bolgiano had purchased from Swartz, for $500

in cash, and $150 by note, the stock, license, furniture, orna-
ments, glassware and other utensils then in the saloon. At
the time the plaintiff owned certain other property which was
on the premises. On March 7th, 1906, Bolgiano gave a chat-
tel mortgage to the plaintiff on all the property on the prem-
ises which it did not own, to secure a loan of $350.00. The
property on account of which this suit was brought included
that which the plaintiff *owned* and that which was embraced
in its mortgage from Bolgiano, and was the property levied
on and sold under the distress proceedings.

Bolgiano owed Swartz between three and four hundred
dollars rent, besides the $150 note, on October 13th or 14th
(the witness was not certain as to the exact date), and he left
the place before the distraint was levied. He went to the
brewery, said he was sick and not able to manage the busi-
ness and offered the keys to Mr. Hamburger, who represented
the plaintiff. Mr. Hamburger told him to give the keys to
Swartz, and Bolgiano sent them to him. Bolgiano testified
he was a monthly tenant under Swartz. He paid Swartz the
$350 which he had borrowed on the mortgage from the plain-
tiff. Hamburger said he demanded the keys from Swartz on
several occasions after they were sent to him, so they could
get in and get the goods; that Swartz promised him the keys
several times, but never gave them to him; that Swartz told
him on several occasions he had a prospective buyer for the
place, and the last time he said he wanted to hold the keys
until the following morning, as he expected to have a cus-
tomer then, but Hamburger said: "The next morning when I
went there to see what was going on I found the constable
in charge." He said he could not state the exact date when
Bolgiano offered him the keys, but it was about the middle
of October; that he went to Swartz to get the keys, "I guess
probably about a week or four days or something like that,"
after he told Bolgiano to take the keys to Swartz. He said
he told Swartz he wanted the keys to get the goods out; that
he could not say exactly when he called on Swartz for the
keys, but said: "Shortly after Mr. Bolgiano gave up the place

I went to see Mr. Swartz about getting the key of the place, and I made five or six requests of Mr. Swartz for that key between the time that Mr. Bolgiano closed the place up and the place was put in the hands of the bailiff."

The auctioneer identified a statement, dated the 25th day of October, 1906, which he had made of the sales to the plaintiff. A bookkeeper of the plaintiff testified that he knew of the distress proceeding by seeing a notice in the papers that the goods were to be sold at public auction; that he then went to Mr. Stewart's office and asked if he would be allowed to take out the goods; that Mr. Stewart said he would have to see Mr. Swartz, and he made an appointment to see Mr. Stewart later, when Mr. Swartz was present. He said that was before the sale. He told Swartz he wanted to remove the property belonging to the plaintiff and that covered by the chattel mortgage, and he replied Mr. Stewart had charge of the affair. He said: "He declined to allow me to act and to act himself and referred me to Mr. Stewart. This was all in Mr. Stewart's office. That the property of the plaintiff was not gotten out before the sale, but was sold. Witness told Mr. Swartz at the same time that he thought the easiest means would be the best, and that if he would not permit us to take our stuff out of there, there was only one thing for us to do, and that would be to bring action for the damage we sustained by the loss in having our property sold to pay the rent, and the property was sold." The witness also testified that the plaintiff paid the auctioneer $244.50 for purchases made by it, and said there was a cash register mentioned in the mortgage. He asked Mr. Stewart at the sale why that was not offered, and he said he had given Mr. Swartz permission to take it from the premises, but he would speak to Swartz about it. Mr. Swartz called to see him about it, but he demanded it of him and he produced it; that the plaintiff still has it, awaiting the result of this case. The distress proceedings were taken out by Mr. Stewart, agent for the landlady.

The defendant denied any knowledge of the distress pro-

ceedings until his wife saw a notice of the sale in the papers, and Mr. Stewart testified that it was not made in collusion with Swartz. There is no question in this State about the right of the landlord to distrain on the goods of a stranger on the premises, excepting such as are exempt by statute. That includes the right to distrain on the goods of a sub-tenant, and on those of the tenant or sub-tenant, although subject to a mortgage. But it is also well settled that a stranger whose goods are seized is entitled to redeem them and to be reimbursed by the lessee, or if they are sold he can recover the value from the lessee. *Edmunds* v. *Wallingford,* 14 Q. B. Div. 814; *Exall* v. *Partridge,* 8 T. R. 308; *O'Donnell* v. *Seybert,* 13 S. & R. 54; 9 *Am. and Eng. Enc. of Law,* 639. "A stranger whose property is sold under a distress may buy it in and recover the amount paid in an action against the tenant." *Ibid.,* Note 2, citing *Wells* v. *Porter,* 7 Wendell (N. Y.), 119; *Gear on Landlord and Tenant,* 151.

A great deal of the brief of the appellant is devoted to a discussion of the question whether there could be a recovery in an action of *trover.* There can be no doubt there was ample evidence to show that the plaintiff had the right of immediate possession at the time of the distress and sale. Most of the property in controversy belonged to the plaintiff, and the rest was included in its mortgage. It is true that the note secured by the mortgage was payable on demand, but there was a provision in the mortgage that "if the mortgagee shall at any time feel insecure, or shall desire to take possession of the same, then the whole indebtedness shall at once become due and the said mortgagee, its successors and assigns, agents or attorneys, shall have the right to take immediate possession of said property," etc. Bolgiano testified that some time in the month of October he went to the Brewing Company, "when he was in default of the payment on his chattel mortgage and the witness was about to leave the premises." He abandoned the place and told Mr. Hamburger: "He was sick and suffering from nervousness, and was not able to manage the place, and it was no use for him holding on any longer,

400    SWARTZ vs. G.-B.-S. BREWING CO:

Opinion of the Court.    [109

and here were the keys to the premises." Hamburger direct-
ed him to take the keys to Swartz as he testified, "because in
the first place he had no right to it, because he was not the
owner of the property, and knowing at the time that Swartz
had a lease on the property, he was entitled to the key, and
, did not know how Mr. Bolgiano stood as to his rent with Mr.
Swartz, and thought it was no more than due to Mr. Swartz
to see that he got the key, and if any arrangement satisfac-
tory between himself and Mr. Bolgiano could be made, he
would give him a chance." There was, therefore, a surrender
of the premises by Bolgiano to *somebody*, and under the mort-
gage, as between Bolgiano and the plaintiff, the latter un-
doubtedly had the right of immediate possession of the prop-
erty included in it. As to the other property of the plaintiff,
there could be no question about its right of possession.

That there was some evidence of demand being made be-
fore the distress is equally free from doubt. The testimony
of Hamburger, as shown above, was that he demanded the
keys of Swartz five or six times between the time Bolgiano
closed the place up and it was put in the hands of the bailiff.
Again, he said that he told Swartz he wanted the key, so as
to take the goods out if no buyer could be found, "and Mr.
Swartz told me that he had a prospective buyer that he would
have there at the place the next morning following. That
was the last time." He demanded the key in order to get
the goods out, and it is useless to argue that there was a de-
mand for the keys, but not for the goods.

There was also some evidence of conversion by Swartz.
He not only did not give up the keys but, if Hamburger is
correct in his statement, the jury could very properly have
inferred that he was keeping them so the property would be
there to be levied on. When Hamburger went there the next
morning the place was in the charge of the bailiff. The evi-
dence does not show where the bailiff got the keys to get in
the premises, but as Swartz had them he must either have
gotten them from him or through him, as it will not be pre-
sumed he committed a trespass in getting into the property.

Swartz said that when Mr. Hamburger's son went for the keys, he told him he had sent them over to Mr. Stewart and added: "That was after the distraint"—whether he meant to say he sent the keys, or what he told Mr. Hamburger's son, was after the distraint is not clear, but the jury was not obliged to accept his statement, if he meant the former. He said in chief that he removed the cash register "when the sale was to take place," and on cross-examination he said he "sent a boy to the premises for the cash register on the same day that the keys were brought up by Mrs. Bolgiano. The key was sent the witness a day or two before the distraint was made; don't think it could have been longer than two days; might have been three."

Mr. Stewart said he "asked Mr. Swartz a number of times to pay the rent before distraint was issued. Witness does not think he told Mr. Swartz he was going to distrain, but told him somebody had to pay the rent, as he could not let it run on that way; that he was not going to wait any longer; will not swear that he did not tell him he was going to distrain. May have told him he was going to distrain if rent is not paid, but does not remember whether he did or not." As Mrs. O'Brien looked to Swartz for the rent, the jury might very properly have inferred that Mr. Stewart did tell him, and under all the circumstances it would be difficult to believe that Swartz did not know that there would be a distraint.

So without further referring to the testimony, there was unquestionably some evidence tending to show that Swartz had taken possession of the premises; that demand was made on him, and that he knew there would be distress proceedings taken out, as well as some evidence from which the jury could infer that Swartz was holding the keys until they were, so that the plaintiff's goods would be seized for his rent. It is said in 1 *Poe,* sec. 522, that "any wrongful interference with the owner's possession or right of possession is in law either a conversion itself, or evidence from which a previous or continuing conversion may be implied;" and again in the

same section: "In short, anyone who, without authority, interferes with the rightful owner's absolute dominion over his goods, whether he do it for his own personal advantage or for the advantage of another, or through inadvertence, or under a mistake as to his own legal rights, or otherwise, may be made responsible in *trover*." That is said under the discussion of the from of declaration provided for in the Code, which has materially modified and changed the declaration in *trover* formerly in use in this State.

So if it was necessary to show that there was evidence sufficient to sustain the action of *trover,* there is such in this record, but there is no prayer which distinctly raises the question of pleading. None of the prayers refer to the pleadings in any way whatever, excepting the defendant's *third* and *fourth,* which do speak of the property "mentioned in the declaration," but those prayers were defective for reasons we will state presently, even. if they be said to be sufficient to call the Court's attention to the pleadings. When prayers do not refer to the pleadings, "the right to recover depends not upon the form of the action or the state of the pleadings, but solely upon the case made by the proof," as was said in *W. Va. C. R. Co.,*v. *Fuller,* 96 Md. 652, and other cases.

What we have said is sufficient to show that in our judgment there was no error in rejecting the defendant's *first* prayer, which sought to take the case from the jury on the ground that there was no legally sufficient evidence to entitle the plaintiff to recover. The *second* was also properly rejected. The complaint of the plaintiff is that *the defendant* owed the landlady rent for which the plaintiff's property was taken under distress proceedings against him. He had not issued a distress warrant against Bolgiano, and if he had, other questions would have arisen—such as whether he had not accepted a surrender of the premises, etc. The *third* prayer asked the Court to instruct the jury "that there was no privity of contract or estate between the defendant and the plaintiff, and hence no duty or obligation on the part of the defendant to protect the plaintiff's goods from distress while on the prem-

ises mentioned in the evidence in the possession of the defendant's tenant," etc.    Privity of contract or estate was not necessary under what we have said, and it was the defendant's duty to protect the plaintiff's goods from being taken for rent due by him.    The defendant's *fourth* prayer was sufficiently covered by the Court's instruction, but at any rate it was misleading with reference to "actual possession," as the jury might have thought he had to be actually on the premises at the time of the distress.    The *sixth* prayer was also properly rejected.    Without discussing it at length, the concluding part was sufficient to cause it to be rejected—that "the refusal of the defendant to deliver said key to the plaintiff, if they find such refusal, was not a taking of possession or conversion."    It was evidence of conversion under the circumstances of this case, as we have shown above.    The *seventh* is clearly not in accord with the authorities as to the measure of damages, which in *trover* under our rule in this State is the value of the chattels at the time of conversion, with legal interest thereon up to the date of the verdict. 1 *Poe,* sec. 219, and cases cited.    It follows from what we have said that the measure of damages as stated in the plaintiff's *second* prayer was correctly announced.    The modification by the Court of the prayer as offered was: "And the only evidence in this case as to value is the gross amount which said goods brought at the auction sale mentioned in the evidence."    That was sufficient evidence of the value—at least so far as the defendant was concerned, as no evidence of their value could have been offered which would have been fairer to him.    There was nothing to show that any unusual prices were received, and surely a sale under distress proceedings will not be presumed to be for more than the goods are really worth.    What we have said above applies to the defendant's special exception to that prayer.    The Court's instruction gave the defendant the benefit of all he was entitled to.    The objection urged that there was no legally sufficient evidence of some of the questions submitted in it is not only answered

by what we have said above, but there was no special exception to the instruction on that ground.

It follows from what we have said that the judgment must be affirmed.

> *Judgment affirmed, the appellant to pay the costs, above and below.*