# UNIVERSAL C. I. T. CREDIT CORPORATION
## *v.* CONGRESSIONAL MOTORS, INC.

[No. 148, September Term, 1966.]

*Decided April 12, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*Burton Yavener,* with whom was *Joseph Luria* on the brief, for appellant.

*Joseph A. Lynott, Jr.,* with whom was *Robert Windsor* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

At issue is the priority between a landlord's lien on automobiles of his tenant, a dealer, in the leased premises and the lien of a lender who had advanced the dealer the purchase price of the automobiles and prior to the levy under the warrant of distraint had perfected a security interest in them under the Uniform Commercial Code to cover his advances.

Congressional Motors, Inc. had leased premises in Montgomery County to Peter Palmer, Ltd., an automobile dealer. In early December 1965 Palmer owed rent to Congressional which directed the sheriff to levy upon seven automobiles owned by Palmer and located on the leased premises. The sheriff, having learned that Universal C.I.T. Credit Corporation was claiming a lien for its advances to Palmer superior to that of the landlord, refused to sell the automobiles as directed by Congressional, which then sought mandamus to compel the sale. Universal intervened, asserting its claimed prior lien. Judge Pugh ruled that the landlord had priority and ordered the sale of the automobiles.

The priority between the landlord's lien and Universal's lien must be determined by the state of the law in December 1965 when the levy under the distraint warrant was made. If the levy had been made on or after January 1, 1966, Universal's security interest would have been explicitly preferred to the landlord's lien under § 16 of Ch. 915 of the Laws of 1965, effective January 1 (Code, Art. 53, § 16), which completely revised and formalized the law of distress.

Universal, the lender, asserts, as it did below, that the provisions of the Uniform Commercial Code are applicable and controlling. In considering the contention we must examine the law of distress as it existed before 1966, including the extent to which it exempted property on the demised premises subject to security devices and the effect the passage of the Code had on the preexisting law.

Before 1966 distress was a mixture of rules of the common

law, many stemming from feudal times, implementing and supplementing Maryland legislation and long-standing practice.

In 1964 the Committee on Laws of the Maryland State Bar Association said in reporting on the bill which later became Ch. 915 of the Laws of 1965:

> "The present distraint law in Maryland is archaic in that a landlord's remedy of distress is exercised without supervision by any court in spite of the substantial rights, and important interests, of tenants and landlords which are involved. The sheriff or constable now acts merely as an agent of the landlord. No court record is made with respect to a distress proceeding including the levy and sale of goods on the leased premises." (69 *Transactions of the Maryland State Bar Association* 305.)

Despite its somewhat amorphous structure, the Maryland law of distress prior to 1966 had definitely established rules and principles. A landlord had a "quasi-lien" for unpaid rent on the goods of his tenant subject to distress even before the levy under the distraint warrant, Rhynhart, *Law of Landlord and Tenant*, 20 Md. L. Rev. 1, 36; *Thomson v. Baltimore & Susquehanna Steam Co.*, 33 Md. 312, 319. In *Calvert Bldg. & Const. Co. v. Winakur*, 154 Md. 519, 531, Judge Parke, speaking for the Court, said:

> "But a *quasi* lien in the sense used in *Thomson v. Baltimore, etc. Co., supra,* and the other cases cited, means nothing more than the potential right of a landlord to subject to distress the goods and chattels on the demised premises for the rent in arrear." [1]

---

1. In 2 Tiffany, *Landlord and Tenant*, § 320, pp. 1897-98, in discussing liens in favor of a landlord arising apart from statute or agreement, the learned author says: "By the word 'lien,' as we use it in this chapter, is meant a right, as regards particular property, to obtain satisfaction of a claim by the forced sale of such property * * *. Occasionally the right of distress itself has been characterized as a lien, this having reference apparently to the priority obtainable by distress as regards the property subject thereto." Mr. Tiffany cites as authority, inter alia, the fact that

The cases have held that the quasi lien of the landlord becomes a lien either upon levy, *Buckey v. Snouffer,* 10 Md. 149, 155; *Stewart v. Clark,* 60 Md. 310, 311; *Mears v. Perine,* 156 Md. 56, 62; *Gay Investment Co. v. Comi,* 230 Md. 433, 437, or upon assertion of the right under the Statute of 8 Anne, Ch. 14, § 1, to be paid up to one year's rent in arrears by another creditor levying execution or attachment. *Gaither v. Stockbridge,* 67 Md. 222, 228; *Calvert Bldg. & Const. Co. v. Winakur, supra,* at pp. 528-31 of 154 Md.; Rhynhart, *op. cit.,* says (p. 36):

> "This quasi-lien may be converted to a lien, even without a distress under the Statute of 8 Anne, Ch. 14, and if the landlord's claim for rent is properly established it will take precedence over the debt on which an attachment issues and he is entitled to be first paid out of the proceeds of the property condemned."

In bankruptcy the landlord had a prior lien on the proceeds of sale of the bankrupt's assets sold by the trustee if the landlord had levied distress before the tenant's adjudication as a bankrupt, *Irving Trust Co. v. Burke,* 65 F. 2d 730, 731-32 (4th Cir.), and the lien acquired by such a levy within four months of a bankruptcy petition was not voidable as it was regarded as one secured other than through legal proceedings. *In re Potee Brick Co. of Baltimore City,* 179 Fed. 525, 530 (Rose, J., D. Md., 1910).

The landlord could distrain on any goods and chattels on the premises whether owned by the tenant or owned by another or subject to liens in favor of another, except as such goods were exempted by law. *Giles v. Ebsworth,* 10 Md. 333, 345; *Trieber v. Knabe,* 12 Md. 491; *McCreery v. Clafflin,* 37 Md. 435; *Swartz v. G. B. S. Brewing Co.,* 109 Md. 393, 399; *Mears v. Perine,* 156 Md. 56. Two recent cases in which otherwise valid preexisting liens of lenders were held inferior to the landlord's because they were not such liens as were expressly given pref-

---

Salmond, *Jurisprudence* (at p. 525) "a modern work of high character" so refers to the right of distress and says: "The word lien has not succeeded in attaining any fixed application as a technical term of English law. Its use is capricious and uncertain."

erence by the exemption statute, Code (1957), Art. 53, § 18, are *J. Holland & Sons v. Littleman*, 225 Md. 84, and *Gay Investment Co. v. Comi*, 230 Md. 433, *supra*. The rule that the goods of a stranger were liable equally with those of the tenant had its origin in feudal times. This ancient privilege was regarded as an inseparable incident of the seigniory and as a remedy which was confined to the land out of which the rent issued. The tenant owed the rent but the remedy was enforced against the land as if it were the debtor. *Emig v. Cunningham*, 62 Md. 458, 460-61. (See also Rhynhart, *Distress*, 13 Md. L. Rev. 185 and 190; Rhynhart & Schlitz, *Civil Practice before People's Courts and Justices*, ¶ 14:23, and authorities cited.)

Goods and chattels of strangers which at the times here pertinent were exempt from distress and liens which were then superior to the landlord's lien were set out in detail in § 18 of Art. 53, as it read in 1965. That section after exempting from distress a number of specified articles not the property of the tenant provided that, except in Prince George's County, if the landlord should distrain on any non-exempt goods or chattels covered by "a conditional contract of sale defined in § 66 of Article 21 or mortgaged by the tenant by a purchase money chattel mortgage under the terms of §§ 41 to 51, inclusive, of Article 21," he should either release such property from the distraint or pay the balance due "under such conditional contract of sale or mortgage."

Universal's lien was not a conditional contract of sale as defined in § 66 of Art. 21 of the Code as it read before its express repeal by the Uniform Commercial Code because title to the liened automobiles was never in Universal, the lender, nor was that lien a purchase money chattel mortgage within the terms of §§ 41-51 of Art. 21 and the contemplation of § 18 because the money it secured was not due from Palmer, the vendee, to the vendor of the automobiles for or on account of the purchase price, but was money advanced by a third person to provide the purchase price. The purchase money chattel mortgage exempted by § 18 was such a mortgage as it was defined by Maryland law prior to the enactment of the Uniform Commercial Code, § 9-107. Although § 9-107 now defines "purchase money security interest" as one taken or retained by the seller to secure all or

part of the price or taken by a person who makes advances or incurs an obligation to enable the debtor to acquire rights in or use of the collateral, *Gay Investment Co. v. Comi, supra,* makes clear that before the Commercial Code only a chattel mortgage which secured the vendor for all or part of the purchase price was a purchase money chattel mortgage. Thus, under Maryland law as it existed before the enactment of the Uniform Commercial Code, the landlord's lien would have had priority over Universal's perfected interest since Universal did not have an interest of the types specifically excepted from distraint by § 18 of Art. 53.

We turn to whether the Uniform Commercial Code repealed § 18 of Art. 53 of the Code and enacted its own rules as to priority between a landlord's lien and a perfected Code security interest or amended that section to do this. It did not do either in terms. The lender explicitly concedes, as it must, that there was no complete repeal of § 18 of Art. 53 by virtue of Code (1964 Replacement Vol.), Art. 95B (Uniform Commercial Code), § 10-103, declaring that "all laws and parts of laws inconsistent with this article are hereby repealed." It really argues only that the Commercial Code impliedly amended § 18 of Art. 53 so as to add as exempt from distress chattels covered by security "financing statements" to those under conditional contracts of sale and purchase money chattel mortgages. We think Universal's concession is correct but that its contention of implied amendment is not.

It would be hard to deduce that the Legislature intended to repeal the exemption given by § 18 to conditional contracts of sale and purchase money chattel mortgages since these forms of secured financing were among the security interests recognized and protected by the Commercial Code, and § 18, if it remained in effect, would extend their effectiveness. Further the able and knowledgeable subcommittee on laws of the Maryland State Bar Association (which included the president of the Senate, a law professor who was also a member of the Association's committee on the Commercial Code and a lawyer experienced and active in debtor-creditor relationships) which prepared the bill to revise the law of distress,[2] the Legislative Council which

2. The sub-committee worked on the bill from 1962 to 1964, dur-

recommended the bill to the Legislature and the Legislature which passed it unchanged as Ch. 915 of the Laws of 1965 could scarcely have reasonably thought that the Uniform Commercial Code had repealed § 18 because Ch. 915 in terms repealed that section as it then existed and enacted in its place a new § 16 to provide inter alia that all chattels covered by "a recorded conditional contract of sale or chattel mortgage or any other security interest which shall have been recorded prior to the levy under said distraint," shall, in effect, be exempt from distress. There is no suggestion in the report of the sub-committee (69 *Transactions of the Maryland State Bar Association* 305-07) or in the recommendation of the Legislative Council (*Report to The General Assembly of 1965*, p. 54), or in Ch. 915 itself that the repeal of § 18 and the enactment of § 16 of Art. 53 was intended to declare or clarify the law of distress. as it was after the enactment of the Uniform Commercial Code, or that it was other than a usual repeal of an existing, effective statute.[3]

The matter of whether the Commercial Code impliedly amended § 18 of Art. 53 requires consideration of the purposes. of that Code and the provisions enacted to accomplish those purposes.

The basic plan of Art. 95B is to deal with the normal and ordinary aspects of a commercial transaction from start to finish by means of nine subtitles, eight of which are devoted to a specific phase or facet of commercial activity.

Subtitle 1 provides the general rules of construction and definitions applicable to all of the other subtitles. Section 1-103 (references, unless otherwise noted, will be to Code [1964 Replacement Vol.] Art. 95B) provides that "unless displaced by the particular provisions of this article, the principles of law and equity, including the law merchant * * * shall supplement its provisions."

---

ing which period the Uniform Commercial Code was being considered and passed.

3. It is not unusual for the Legislature to state that an enactment is declaratory or corrective, if this is what it intends. See, for example, Ch. 44 of the Laws of 1965 where the language was "to repeal and reenact, with amendments Section * * * to correct a reference contained therein."

The purposes of subtitle 9—Secured Transactions—are well summed up in the appendix to the interim report of the Committee on the Commercial Code to the 1962 Mid-Winter Meeting of the Maryland State Bar Association (67 Transactions 276, 280-81) :

> "This Article will replace our present chattel mortgage, conditional sale, trust receipt, factor's lien, pledge and assignment of accounts receivable statutes. The basic and fundamental idea of the Article is that all of these present varying types of security arrangements can be, and, in the Code, they are assimilated into one single lien concept or interest in personal property which is called a 'Security Interest', with such security interest having different effects which are spelled out in detail depending upon the type of transaction out of which the security interest arises. Under the Article all secured transactions involving personal property would be governed by a single, well organized and comprehensive set of rules."

The official comment following § 9-101 reiterates this analysis and adds:

> "Under this Subtitle the traditional distinctions among security devices, based largely on form, are not retained; the Subtitle applies to all transactions intended to create security interests in personal property and fixtures, and the single term 'security interests' substitutes for the variety of descriptive terms which has grown up at common law and under a hundred-year accretion of statutes. This does not mean that the old forms may not be used, and Section 9-102 (2) makes it clear that they may be."

Section 9-102 (2) says:

> "This subtitle applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended

as security. *This subtitle does not apply to statutory liens except as provided in § 9-310."* (Emphasis supplied.)[4]

The official comment states that the purpose of § 9-102 is to bring all consensual security interests in personal property, with exceptions specified in §§ 9-103 and 9-104, under subtitle 9. "The Subtitle does not in terms abolish existing security devices" but if they are used the rules of subtitle 9 govern.

Section 9-201—General validity of security agreement—provides "Except as otherwise provided by this article a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." The official comment notes that "exceptions to this general rule arise where there is a specific provision in any Subtitle * * *," as where—"this Subtitle subordinates the security interest because it has not been perfected (Section 9-301) * * *."

Section 9-310 gives those who furnish services or materials to goods subject to a security interest a prior lien over a perfected security interest, with specified exceptions. Section 9-312 defines priority among conflicting security interests in the same collateral, and §§ 9-401-406 and 9-501-507, respectively, establish the mechanics and effects of filing and procedures upon default.

The purposes and provisions of the Uniform Commercial Code lead us to believe that it did not impliedly amend § 18 of Art. 53 by exempting from distress security interests not previously exempted. We find persuasive indications to support that view. *Bell v. State,* 236 Md. 356, 365-67, recognized the theory of implied amendment as applicable in Maryland and delineated its controlling rules. An implied amendment is an act which does not state that it is amendatory but which in sub-

---

4. Section 9-310 headed "Priority of certain liens arising by operation of law" provides that "When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise."

stance alters, modifies or adds to a prior act. Like repeals by implication, amendments by implication are not favored and will not be found unless there is a manifest repugnancy or irreconcilable conflict between the prior and the later act. If the two statutes can stand and be read together, there is no amendment of the first by the second, and the Code and § 18 of Art. 53 can be read together.

As we have noted subtitle 9 of the Commercial Code applies to all consensual security interests that are not specifically excluded by §§ 9-103 and 9-104, as § 9-102 makes plain. Section 9-104 lists a number of the "transactions excluded from subtitle" 9. The operative words here pertinent are:

> "This subtitle does not apply * * * (b) to a landlord's lien; or (c) to a lien given by statute or other rule of law for services or materials except as provided in § 9-310 on priority of such liens."

It appears that a landlord's lien and an artisan's lien were excluded from the applicability of subtitle 9 because they are nonconsensual. Comment 1 to § 9-102 says that "* * * the principal test whether a transaction comes under this Subtitle is: Is the transaction intended to have effect as security? For example, Section 9-104 excludes certain transactions where the security interest (such as an artisan's lien) arises under statute or common law by reason of status and not by consent of the parties." 2 Hawkland *A Transactional Guide to the Uniform Commercial Code,* § 2.2201, p. 569, states:

> "The policy of Article 9 [Subtitle 9 of Article 95B] is to bring within its scope all transactions that are intended to create security interests in personal property or fixtures, and this policy, therefore, excludes real estate security, such as mortgages and landlord's liens, as well as personal property transactions that are not consensual in nature. Thus, artisan's liens generally are excluded from Article 9 because they are created not by agreement but by operation of positive law. Positive law creating non-consensual liens often reflects local considerations and value judgments, and

the draftsmen of the Code decided not to interfere with it."

We conclude that the flat and unqualified exclusion of landlord's liens from the application of the subtitle left the law on such liens as it was. The exclusion was not limited to ruling landlord's liens out as a Code security interest or to freeing them from procedural requirements applicable to such security interests; it provided in effect that no part, including rules as to priorities, of subtitle 9 controlled or governed them. This left their status and priority vis-a-vis those of security interests to the existing law. This was the view taken by the District Court for the Eastern District of Pennsylvania, *In re Einhorn Bros., Inc.,* 171 F. Supp. 655, 660, and the Court of Appeals for the Third Circuit, which affirmed under the same name in 272 F. 2d 434, 440-41. On the point here involved, the federal courts, in applying the law of Pennsylvania which adopted the Uniform Commercial Code in 1958 and which had a body of law on distress essentially the same as that of Maryland,[5] held that as the Commercial Code in terms did not apply to a landlord's lien it did not deprive a landlord of the priority his perfected rent claim had under Pennsylvania law and therefore a landlord's lien continued to be superior to those consensual liens to which it was superior before the Code. See also 2 Anderson *Uniform Commercial Code,* § 9-104:3, pp. 480-81, and Schwartz, *Pennsylvania Chattel Security and the Uniform Commercial Code,* 98 U. of Pa. L. Rev. 530, 540-41, where the author, in discussing whether a landlord's distraint for rent would take precedence over a Code security interest, pointed out that it had been held that the Pennsylvania exemption-from-distress statute did not exempt chattel mortgages, and suggested: "Should this decision be followed, form might retain importance even under the Commercial Code. To avoid such an unfortunate result, it is suggested that the exemption statutes be revised to protect any security interest in the designated types of collateral." Maryland as we have seen, did by Ch. 915 of the Laws of 1965, just what was suggested.

---

5. Pa. Stat. Ann. tit. 68, § 250:302, and notes; Firestone Tire & Rubber Co. v. Dutton, 205 A. 2d 656 (Pa. Super.).

We think the intention to completely exclude a landlord's lien from every part of subtitle 9 is emphasized by the provision of § 9-104 (c), immediately following that as to landlord's liens, which gives artisan's liens priority over perfected security interests as in § 9-310 provided. The comment to § 9-310 makes plain that the reason for giving priority expressly to artisan's liens is that "there was generally no specific statutory rule as to priority between security devices and liens for services or materials" since many decisions made the priority turn on whether the secured party did or did not have "title." A major Code purpose was to do away with differences and distinctions based on form (although allowing the retention of differences for other purposes, such as between the parties or for purposes of taxation) and the express rule of priority of § 9-310 accomplished this.

The lender argues that the landlord's lien which the Commercial Code excludes from the ambit of subtitle 9 must be a statutory lien to qualify and that in Maryland the right of a landlord to seize and sell chattels on the leased premises (the right to sell the chattels was added to the right to seize them in 1690 by the statute of 2 W. & M., c. 5) is merely a right and a remedy and if it becomes a lien upon levy it is not a statutory lien.[6]

The District Court for the Eastern District of Arkansas, in *In re King Furniture City, Inc.,* 240 F. Supp. 453, held that a lien in favor of the landlord created by the lease was not excluded from the coverage of subtitle 9 and in the course of the opinion did say (at p. 457) : "It also appears that the term 'landlord's lien' as used in the statute must be interpreted as referring to liens created by statute, for the matter of liens on property such as here involved is obviously considered by all of the remainder of the Code as fitting into a general commercial statute." The actual holding of the case on this point was that the lien created by the lease was within the applicable

---

6. Code (1957), Art. 21, § 66 (which was repealed by Ch. 538 of the Laws of 1963 which enacted the Uniform Commercial Code) gave statutory recognition to the lien of a landlord when it listed "landlords with liens" among those preferred to an unrecorded conditional sale contract.

provisions of the Commercial Code since under the law of Arkansas (which "does not recognize the 'harsh and oppressive remedies' of the landlord's common law right of distraint") the lien was one created by contract. 2 Anderson *Uniform Commercial Code,* 1966 Cum. Supp., p. 71, correctly summarizes the real holding in *King* and the applicable law as follows:

> "The landlord's lien which is excluded from the Code is the lien which arises by operation of law or statute. The exclusion clause of the Code does not apply to an express contractual lien given the landlord by the lease with respect to all personal property brought by the tenant on to the premises. Consequently, the express contractual lien is subject to Article 9 of the Code."

As has been noted, the landlord in Maryland had a lien by operation of law when the levy was made under the warrant of distraint. We conclude that this lien was "a landlord's lien" as that term is used in § 9-104 (b) of the Commercial Code, and therefore is excluded from the operation of subtitle 9. Liens of landlords arising by operation of law, as well as statutory liens would seem to have been contemplated because § 9-102 (2) in terms exempts statutory liens and unless other landlord's liens than those arising by statute were meant, there would have been no need to have used paragraph (b) as part of § 9-104. Liens of landlords arising by operation of law meet the test of being nonconsensual.

It is suggested that because § 9-201 provides that a perfected security interest is valid against creditors and § 9-301 (1) (b) gives priority to one who becomes a lien creditor without knowledge of a security interest before the security interest was perfected (and, so, it is inferred that it gives priority to the perfected security interest over a subsequent lien creditor) the landlord's lien must be subordinate to a security interest perfected before the landlord's lien came into being. A lien creditor is defined as one who acquires a lien by attachment or levy and it may be that the landlord's lien in Maryland acquired, as it was, without judicial aid, was not acquired by levy as that word is used in the Commercial Code. Assuming that it was,

these sections did not change the law. Code (1957), Art. 21, § 48, made perfected mortgages of personal property valid against creditors, as does § 9-201 of the Code. Nevertheless, in *Gay Investment Co. v. Comi, supra,* we held that chattels covered by a chattel mortgage which had been perfected before a landlord's lien became choate by levy was not exempt from distress because the mortgage was not a purchase money chattel mortgage under the then Maryland law.

Code (1957), Art. 21, § 66, like § 9-301 (1) (b) of the Code, subordinated an unrecorded conditional sales contract to subsequent purchasers, mortgagees, incumbrancers, landlords with liens, pledgees, receivers and creditors who acquired without notice a lien by judicial proceedings. By necessary inference and judicial holding, see *In re Careful Laundry,* 204 Md. 360, a perfected conditional sales contract was superior to the named classes. We held, however, in *J. Holland & Sons v. Ettleman,* 225 Md. 84, that a conditional contract of sale duly executed and recorded in Prince George's County was not effective under § 66 of Art. 21 to give priority as against a landlord's lien because § 66 of Art. 21 and § 18 of Art. 53 of the Code must be read together and since § 18, which created an exception to the general rule that a landlord may seize and sell all chattels on the demised premises not exempt by statute, whether they belong to others or not, expressly was made inapplicable to Prince George's County, the landlord in that County could prevail.

It is further suggested that since Ch. 538 of the Laws of 1963 which enacted the Commercial Code expressly repealed §§ 41 through 67 of Art. 21 of the Code, § 18 of Art. 53 was rendered inoperative to exempt property covered by conditional sales contracts and purchase money chattel mortgages from distress because § 18 exempted only conditional sales contracts "defined in § 66 of Art. 21" and purchase money chattel mortgages "under the terms of §§ 41 to 51, inclusive, of Article 21." The quoted passages were shorthand aids in identifying and defining what was to be exempt and their effect was to incorporate by reference the provisions of Art. 21 which would identify and define. The Commercial Code did not abolish or purport to abolish conditional contracts of sale or chattel mortgages;

indeed, their continued use, subject to the rules of that Code, was contemplated. The repeal of the statutes incorporated by reference into § 18 did not, we think, destroy the ability to identify and define the kind of instruments given exemption by § 18.

If it be assumed that the portions of § 18 here involved were rendered inoperative by the repeal of the identifying and definitional parts of Art. 21, the lender would not be helped. As we noted earlier, in such case there simply would have been no exemption from distress for property covered by any security device.

*Order affirmed, with costs.*