628 A.2d 215

**TILGHMAN HARDWARE, INC.**

v.

**Darryl LARRIMORE.**

**No. 109, Sept. Term, 1992.**

Court of Appeals of Maryland.

July 29, 1993.

Wayne T. Kosmerl (Council, Baradel, Kosmerl & Nolan, P.A., on brief), Annapolis, for petitioner.

Richard S. Phillips (Walsh & Phillips, P.A., on brief) Easton, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case involves the credit sale of a Chesapeake Bay skipjack, the *Nellie L. Byrd*.[1] The sole issue is whether the deferred portion of the purchase price was secured by a security interest in the vessel, or whether the transaction was an unsecured sale on credit.

On March 10, 1989, petitioner, Tilghman Hardware, Inc. (Tilghman), agreed to purchase the *Nellie L. Byrd* from respondent, Darryl Larrimore (Larrimore), "subject to the terms and conditions contained in" a written contract, signed by both parties (the Agreement). A United States Coast Guard documented vessel, the *Nellie L. Byrd* weighs twenty-two tons and is 53.6 feet long. Included in the sale of the

---

1. A skipjack is a working sailboat indigenous to the Chesapeake Bay. The vessel is characterized by a flat-V bottom, sides, a schooner bow, centerboard, and sloop-type rigging on a strongly raked mast with a long boom. It is used in the dredging of oysters. *See* H. Owens, *Baltimore on the Chesapeake* 66–67 (1941); M.V. Brewington, *Chesapeake Bay, A Pictorial Maritime History* 65–66 (1953).

vessel was its fourteen foot auxiliary yawl or push boat, the certificate of title to which was issued by the Maryland Department of Natural Resources.[2]

The price was $55,000, payable over time. The Agreement called for a series of deposits: an initial deposit of $500, an additional deposit of $4,500 payable within forty days of execution of the Agreement, $5,389 payable by June 15, 1989, and a debt exchange valued at $2,111.[3] Tilghman had until June 15 to inspect and accept or reject the vessel. If rejected, all deposits would be returned. If accepted, the vessel would be delivered to the buyer. The balance of the purchase price, $42,500, referred to as the "[a]mount to be financed," was to be paid, with interest at nine percent per annum, over five years in accordance with an amortization schedule attached to the Agreement.

Section Six of the Agreement, "Warranties," reads in part:

"Vessel is being sold and purchased free and clear of all debts, claims, liens and encumbrances of any kind whatsoever, except as noted hereinafter and seller warrants and will defend that seller has good and marketable title and will deliver to the buyer all necessary documents for transfer of the title to buyer on or before the dates set forth for final payment."

Section Eight, "Risk of Loss," provides:

"It is agreed by the parties that the risk of loss, injury or destruction of the above described vessel and equipment

---

**2.** Under Md.Code (1974, 1989 Repl.Vol., 1992 Cum.Supp.), § 4–1013(c)(2) of the Natural Resources Article and under the Code of Maryland Regulations, Title 8, § 02.04.03 (1983), a boat that has no device for self-propulsion other than sails and that is being used to dredge oysters may be propelled by means of an auxiliary yawl boat on Mondays and Tuesdays during the oyster dredging season in the Chesapeake Bay, except for specifically excluded locations.

**3.** The "debt exchange" appears to have consisted of the forgiveness by Tilghman of a debt due Tilghman from Larrimore, plus Tilghman's assumption of the debts due by Larrimore to two third parties.

shall be borne by seller until this transaction is closed and the vessel delivered."

Section Ten, "Binding Effect," provides, in part:

"Seller agrees not to sell vessel or to enter into any contract for the sale of vessel while this agreement is in effect."

The Agreement did not state what constitutes a buyer's default; nor did it set forth, directly or by reference, any remedies available to Larrimore in the event of Tilghman's default.

Tilghman took delivery, but failed to make the payments as agreed. In August 1990, Larrimore filed with the District Court of Maryland in Talbot County a "Complaint for Replevin" and a "Request for Emergency Ex Parte Order." [4] The complaint alleged that "title [was] to remain in plaintiff until final payment," and that the historic vessel was not being maintained. Larrimore's request for an ex parte injunction, authorizing him to take immediate possession of the vessel, was granted.

At the hearings in the action, and by a memorandum of law, Tilghman argued that the Agreement transferred all ownership rights in the vessel to Tilghman and that Larrimore had not obtained a security interest in the vessel under Article 9, the Secured Transactions Article, of the Uniform Commercial Code (U.C.C.), Md.Code (1975, 1992 Repl.Vol.), Title 9 of the Commercial Law Article (CL).[5] Thus, Tilghman submitted, Larrimore's remedies were to be found exclusively in Title 2,

---

**4.** "[T]he District Court has exclusive original civil jurisdiction in [a]n action of replevin, regardless of the value of the thing in controversy." Md.Code (1974, 1989 Repl.Vol., 1992 Cum.Supp.), § 4–401(2) of the Courts and Judicial Proceedings Article.

The District Court also has exclusive original civil jurisdiction over "[a] petition for injunction relating to the use, disposition, encumbrances, or preservation of property that is [c]laimed in a replevin action, until seizure under the writ." *Id.* § 4–401(6)(i).

**5.** Unless otherwise noted, all statutory references will be to the Commercial Law Article.

the Sales Article of the U.C.C. Title 2 remedies do not include replevin by a seller.

The District Court ruled that, under the Agreement, Larrimore held a security interest in the vessel. First it noted that "the contract itself, which was drawn ... by Tilghman ... has to be construed, if there is any doubt with regards to the meaning of any specific term ... in favor of Mr. Larrimore and against Tilghman Hardware." Next the court observed that "the contract itself ... appears to be basically a ... conditional sales contract, whereby title ... to the vessel was held by Mr. Larrimore and never actually delivered to Tilghman Hardware" and that "at the time of the default ... title to the vessel had never been transferred to Tilghman." The District Court found

"that the intention of the parties ... was that Mr. Larrimore would retain title to the vessel to secure any interest which he might have, pursuant to the conditional sales, and the sales nature of the contract, rather than pursuing the Uniform Commercial Code security interest requirements."

The court said that the U.C.C. was not the exclusive "means" by which a security interest could be created; rather, Larrimore could have the remedy of repossession or replevin by retaining title subject to Tilghman's making the agreed payments. Accordingly, the court concluded that Larrimore's remedy was not limited to a contract action for the unpaid balance of the price. The writ of replevin issued.

Tilghman appealed to the Circuit Court for Talbot County, which affirmed. The circuit court, relying heavily on § 9–201, reasoned that the U.C.C. had not abolished the ability of a creditor to create an enforceable security interest by a conditional sales contract. The circuit court additionally held that the record supported the District Court's finding that the intent of the parties was to create what amounted to an enforceable security interest in the *Nellie L. Byrd.*

We granted Tilghman's petition for certiorari which raises fundamental questions concerning security interests in credit sales.

Tilghman's various arguments can be summarized as follows:

I. Because the Agreement does not undertake to create a security interest specifically under U.C.C. Art. 9, the Agreement cannot create any enforceable security interest; and

II. The Agreement fails to create a security interest because (A) there is no language granting a security interest and (B) repayment of the amount to be financed is not a condition of the transfer of title.

I

In its certiorari petition Tilghman framed the question presented to be: "Does Maryland recognize a common law right to create consensual security interests in personal property which are exempt from the mandates of [Title] 9 of the Commercial Law Article?" That phraseology is a hyperbolic characterization of the District Court's rationale. We understand the District Court to have held that an enforceable Title 9 security interest can be created by manifesting the intent to do so through language referring to a delivery of possession with a reservation of title to be delivered upon satisfaction of a condition. The circuit court affirmed on that same basis. We agree.

A "security interest" is "an interest in personal property ... which secures payment ... of an obligation." § 1–201(37). With an exception not relevant here, § 9–102 provides, in part, that Title 9 applies

"(1) ...

(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods. . . .

. . . .

(2) This title applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust,

conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security."

The comments to § 9–102 make the rule even more plain, stating, in part:

"Purposes:

"The main purpose of this section is to bring all consensual security interests in personal property and fixtures under this Title, except for certain types of transactions excluded by Section 9–104. . . .

"1. Except for sales of accounts and chattel paper, the principal test whether a transaction comes under this Title is: is the transaction intended to have effect as security? . . . When it is found that a security interest as defined in Section 1–201(37) was intended, this Title applies regardless of the form of the transaction or the name by which the parties may have christened it. The list of traditional security devices in subsection (2) is illustrative only; other old devices, as well as any new ones which the ingenuity of lawyers may invent, are included, so long as the requisite intent is found. The controlling definition is that contained in subsection 1 [of § 9–102].

"The Title does not in terms abolish existing security devices. The conditional sale or bailment-lease, for example, is not prohibited; but even though it is used, the rules of this Title govern."

Similarly, the comments to § 9–101 state in part:

"Under this Title the traditional distinctions among security devices, based largely on form, are not retained; the Title applies to all transactions intended to create security interests in personal property and fixtures, and the single term 'security interest' substitutes for the variety of descriptive terms which had grown up at common law and under a hundred-year accretion of statutes. This does not mean that the old forms may not be used, and Section 9–102(2) makes it clear that they may be."

This Court had occasion to comment on the foregoing sections of Title 9 in *Universal C.I.T. Credit Corp. v. Congres-*

*sional Motors, Inc.*, 246 Md. 380, 228 A.2d 463 (1966), a case involving the priority of creditors' claims to the debtor's inventory. This Court said: "The official comment states that the purpose of § 9–102 is to bring all consensual security interests in personal property, with exceptions specified in §§ 9–103 and 9–104, under subtitle 9. 'The Subtitle does not in terms abolish existing security devices' but if they are used the rules of subtitle 9 govern." *Id.* at 389, 228 A.2d at 469.

Legal commentators agree. *See* 8 R. Anderson, *Uniform Commercial Code* § 9–102:7, at 452 (3d ed. 1985) ("The pre-Code devices are not abolished and may still be employed but they must meet the standards and requirements imposed by the Code on all secured transactions in personal property." (Footnote omitted)); 8 W. Hawkland et al., *Uniform Commercial Code Series* § 9–102:02, at 42 (1990) ("Subsection 9–102(2) represents an attempt by the drafters to make clear the broad applicability of Article 9 by indicating that any contractual arrangement that creates a security interest is within its coverage." (Footnote omitted)); J. White & R. Summers, *Uniform Commercial Code* § 22–1, at 874 (2d ed. 1980) ("In place of the various bodies of substantive law governing the various pre-Code security devices, the draftsmen substituted a single body of law in Article Nine."). *But see* I G. Gilmore, *Security Interests in Personal Property* § 11.1, at 337 (1969) ("But beyond the area of institutionalized transaction, there stretches a no-man's land, in which strange creatures do strange things. For these strange things there are no rules.").

Thus, the fact that the Agreement employs language invoking concepts that are more appropriate to a pre-U.C.C. conditional contract of sale does not prevent the Agreement from creating a security interest governed by CL Title 9.

## II

We now consider those aspects of the Agreement that Tilghman argues prevented the Agreement from effecting a security interest in the vessel. Our concern in this case is

with the rights between the debtor and the party allegedly secured. No third party rights are involved.

In general, "a security agreement is effective according to its terms between the parties." § 9–201. Under § 9–203(1) "a security interest is not enforceable against the debtor ... with respect to the collateral ... unless:

(a) ... the debtor has signed a security agreement which contains a description of the collateral ...;

(b) Value has been given; and

(c) The debtor has rights in the collateral."

Fulfillment of the requirements of subsections (b) and (c) of § 9–203(1) is not an issue here. Tilghman asserts, however, that because the Agreement does not "create[ ] or provide[ ] for a security interest," § 9–105(1)(*l* ), it is not a security agreement.

### A

■ The principal defect asserted is that the Agreement fails to "contain 'language which *grants* to the creditor a security interest.'" Appellant's Brief at 8 (quoting *L & V Co. v. Asch,* 267 Md. 251, 258, 297 A.2d 285, 288–89 (1972)). Tilghman's position is that words of grant are required.

At issue in *Asch* was whether a financing statement could serve as a security agreement. The debtor, a manufacturing corporation, had received advances under a line of credit from the creditor, The L and V Company (L and V). The parties did not memorialize their bargain with a security agreement, but L and V had recorded a financing statement covering most of the debtor's assets. Later the debtor also had executed three demand promissory notes to L and V, the total of which equalled the outstanding principal balance of the advances.

When the debtor executed a deed of trust for the benefit of its creditors, and L and V petitioned for a preferred claim to the assets, the claim was denied. This Court stated the issue on appeal, and its holding, to be

"whether the appellant, L and V, had an enforceable security interest on the basis of the notes and financing statement alone which would entitle it to a preferred claim. We hold that L & V cannot have an enforceable security interest because there was no security agreement signed by the debtor ... as required under [§ 9–203(1)(a) ]."

267 Md. at 254, 297 A.2d at 286–87. We said that the definition of security agreement ("an agreement which creates or provides for a security interest") and § 9–203(1)(a) "have been consistently interpreted by courts as requiring a writing in which the debtor *grants* a security interest to the secured party." *Id.,* 297 A.2d at 287.

The opinion in *Asch* concluded:

"The filing of a financing statement *may* indicate the existence of a security agreement and, indeed, if it contains language which *grants* to the creditor a security interest, it may then serve both as a financing statement *and* a security agreement. There is no language in the UCC to make a financing statement, without words granting a security interest, the equivalent of a security agreement. The granting words are necessary to indicate the intention of the parties to create a security interest; and in the absence of such words, it seems rather clear that the parties did not intend to create a security interest. *See, e.g., In re Nottingham* [, 6 U.C.C.Rep.Serv. (Callaghan) 1197, 1969 WL 11098 (Bankr.E.D.Tenn.1969) ]."

*Id.* at 258, 297 A.2d at 288–89 (citation omitted).

Here, Tilghman seeks to extend the language employed in the holding in *Asch* to a factual situation that was not presented there. That case held that the "short form" of financing statement permitted under § 9–402, standing alone, does not contain words that create or grant a security interest. *Asch* noted, however, that if the financing statement contained "language which *grants* to the creditor a security interest, it may then serve both as a financing statement *and* a security agreement." *Id.* at 258, 297 A.2d at 288–89. *Asch* did not

pass upon the sufficiency of any wording in an agreement to constitute a "security agreement."

The cases cited in *Asch,* and the way in which they were cited, further clarify the *Asch* holding. *Asch* relied in part on *American Card Co. v. H.M.H. Co.,* 97 R.I. 59, 196 A.2d 150 (1963), a case in which a claim of priority in receivership was rejected where the creditor relied on a filed financing statement and promissory note, but where there was no security agreement. We quoted with approval from *American Card,* 196 A.2d at 152, the statement that " 'it is not possible for a financing statement which does not contain the debtor's *grant* of a security interest to serve as a security agreement.' (Emphasis supplied.)." *Asch,* 267 Md. at 254, 297 A.2d at 287. Here there is an agreement providing for deferral of the passage of title and, although there is no financing statement, no third party rights are involved.

*In re Nottingham,* 6 U.C.C.Rep.Serv. (Callaghan) 1197, 1969 WL 11098 (Bankr.E.D.Tenn.1969), cited in *Asch,* also is illustrative. The sole question there was "whether a document signed by the bankrupt when he bought a color television set [met] the requirements of a 'Security Agreement.' " *Id.* at 1197.

After reviewing the document in question, the court concluded:

"It is neither a title retention contract nor a conditional sales contract. It does not create or provide for any security interest in the property. It is therefore my conclusion that such document does not meet the requirements of a security agreement.

"There are no magic words that create a security interest. There must be language, however, in the instrument which when read and construed leads to the logical conclusion that it was the intention of the parties that a security interest be created.... The requirements of the Code for creating a security interest are simple—an intention to create a security interest is all that need be shown—a dozen words or less

are sufficient, but the security agreement must contain language that meets this simple requirement."

*Id.* at 1198–99; see also *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir.1972) ("While there are no magic words which create a security interest there must be language in the instrument which 'leads to the logical conclusion that it was the intention of the parties that a security interest be created.'") (quoting *Evans v. Everett,* 279 N.C. 352, 183 S.E.2d 109, 113 (1971)); *In re Carmichael Enters., Inc.,* 334 F.Supp. 94, 104 (N.D.Ga.1971) ("[A] financing statement attended by other documents or circumstances may suffice as a valid 'security agreement.'"); *Evans v. Everett,* 279 N.C. 352, 183 S.E.2d 109, 114 (1971) (financing statement reciting that collateral secured promissory note held sufficient agreement to create security interest); *In re Center Auto Parts,* 6 U.C.C.Rep.Serv. (Callaghan) 398, 399, 1968 WL 9209 (C.D.Cal.1968) (filed financing statement and promissory note which incorporated by reference the contemporaneously executed financing statement were sufficient to effect security agreement); *In re Martronics Inc.,* 2 U.C.C.Rep.Serv. (Callaghan) 364, 367–68, 1964 WL 8567 (Bankr.D.Conn.1964) (all documents read together provided for a security interest).

The remaining cases cited in *Asch* generally hold that a short-form financing statement alone cannot stand as a security agreement. Such a financing statement merely gives notice to third parties that the party who filed the financing statement *may* have a security interest in the collateral described. *See, e.g., Kaiser Aluminum & Chem. Sales, Inc. v. Hurst,* 176 N.W.2d 166, 167 (Iowa 1970); see also Comment, *Liberal Constructions of the Definition of a Security Agreement Under Section 9–203 of the Uniform Commercial Code: Policy Implications and Practical Limitations,* 57 Temp.L.Q. 791 (1984).

█ Even more clearly demonstrating that neither *Asch* nor the U.C.C. requires that an agreement contain words expressly granting a security interest in order to constitute a security agreement is the Code's treatment of reservations of

title. Section 1–201(37), which defines "security interest," states that "[t]he retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 2–401) is limited in effect to a reservation of a 'security interest.' "

Section 2–401(1), in part, provides:

"Each provision of this title [on Sales] with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this title and matters concerning title become material the following rules apply:

"(1) ... Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the title on secured transactions (Title 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties."

In 1 Anderson, *supra,* § 1–201:205, at 291–92 (3d ed. 1981) (footnotes omitted), the author explains:

"The Code cryptically declares that 'the retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2–401) is limited in effect to a reservation of a "security interest." ' [§ 1–201(37) ]. The thought here embraced is more amply stated in the sales Article in which it is stated: 'Any retention or reservation by the seller of title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest,' [§ 2–401(1) ] and that 'title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest ... and despite any reservation of a security interest by the bill of lading. . . .' [§ 2–401(2) ].

"Where a seller retains title to the goods until paid and delivers possession of the goods to the buyer, the seller's interest is a security interest and is governed by Article 9.

"When it is the intention of the parties, an instrument which purports to relate to title will be deemed to create merely a security interest. Thus, although the transaction purports to reserve title to the seller, this reservation is limited to a security interest."

In *Sommers v. IBM,* 640 F.2d 686 (5th Cir.1981), the trustee in bankruptcy sought to have a creditor declared unsecured on the grounds, *inter alia,* that a purchase order "did not qualify as a security agreement under the UCC since it failed to contain language granting the vendor a security interest in the goods." *Id.* at 688. The court responded:

"[A] 'security agreement' [is defined] as 'an agreement which creates or provides for a security interest.' A 'security interest' is defined as 'an interest in personal property ... which secures payment or performance of an obligation. *The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer ... is limited in effect to reservation of a "security interest."* ' Tex.Bus. & Comm.Code Ann. § 1.201(37) (Vernon Supp. 1980–1981) (emphasis added). Although 'there must be language in the instrument which "leads to the logical conclusion that it was the intention of the parties that a security interest be created," ' *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir.1972), we conclude the language in the purchase order to the effect that [the creditor] 'retains title to said books until paid ...' was sufficient to reserve a security interest in the books to [the creditor]."

*Id.* at 689; *see also Seitz v. Stecklein,* 111 Idaho 364, 368, 723 P.2d 908, 912 (Idaho Ct.App.1986); *In re Charter Co.,* 49 B.R. 513, 516 (Bankr.M.D.Fla.1985); *In re U.I.P. Engineered Prods. Corp.,* 43 B.R. 480, 482 (Bankr.N.D.Ill.1984).

In the instant matter the theory followed by the person drafting the Agreement was to separate possession and title.

Larrimore agreed to deliver possession of the vessel after the series of deposits was paid, but Larrimore reserved title for later transfer. Where, as here, the intent of the parties was to secure the deferred purchase price, the Code operates to give effect to that intent by treating the outmoded reservation of title as creating a security interest. Language expressly granting a security interest from buyer to seller is not required under these circumstances.

## B

█ The agreement provides that seller "will deliver to the buyer all necessary documents for transfer of the title to buyer on or before the dates set forth for final payment." Tilghman argues that "[h]ad the seller desired to retain an interest in the vessel to secure payment, the contract would have provided that title be transferred *following* final payment, rather than '*on or before* the dates set forth for final payment.'" Appellant's Brief at 9. No cases are cited.

The "on or before" phraseology does not alter our conclusion. The schedule for the monthly payments, incorporated into the Agreement, covered a period of five years. Use of the "on or before" language makes it clear that the debtor may prepay and thereby avoid any question whether the common law rule applicable to real estate mortgages applies to the subject transaction. *Cf. Promenade Towers Mut. Hous. Corp. v. Metropolitan Life Ins. Co.*, 324 Md. 588, 603, 597 A.2d 1377, 1384 (1991) ("[U]nder Maryland common law, a mortgagor or grantor under a deed of trust payable at a fixed date or dates in the future, does not have a right to prepay, absent provision for prepayment in the loan contract."). If the full purchase price were paid prior to the "dates [sic] set forth for final payment," Larrimore would deliver "all necessary documents for transfer of the title" at that earlier time.[6]

---

6. It is unnecessary for us to consider either the procedural propriety or the merits of an additional issue or argument, based on federal law, that has been raised by Larrimore as respondent in this Court.

JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, TILGHMAN HARDWARE, INC.